[No. B229451. Second Dist., Div. Eight. Aug. 18, 2011.]

In re J.H., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
TYRONE M., Defendant and Appellant.

COUNSEL

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

OPINION

**BIGELOW, P. J.**—Tyrone M. appeals from a juvenile court order denying his request that he be designated the presumed father of minor J.H. and deeming him only an "alleged biological father." We find the juvenile court's parentage ruling incomplete in that it failed to determine biological paternity and therefore reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2010, Los Angeles County Department of Children and Family Services (DCFS) detained then two-year-old J.H. and his eight-month-old brother. In the first version of the dependency petition, DCFS alleged the mother (mother) had suffered domestic violence at the hands of her male companions, George H. and Frederick B. According to the petition, in August 2009, George H. hit mother and fractured her face in four places. As a result

of this attack, George H. was arrested and charged with inflicting corporal injury to a spouse or cohabitant. The petition also alleged that mother's abuse of marijuana rendered her incapable of providing the children with regular care and supervision, and that mother failed to take psychotropic medication to manage her mental and emotional problems. The petition also alleged that Tyrone M., "J.H.'s father," failed to provide him with the necessities of life, and that Tyrone M.'s whereabouts were unknown. The detention report noted George H. was identified as J.H.'s father on J.H.'s birth certificate. George H. was incarcerated.

Following J.H.'s removal from mother's custody, Tyrone M. participated in a team decision meeting and subsequently appeared at the July 2010 detention hearing. He filed a Judicial Council form JV-505: Statement Regarding Parentage (JV-505 form). In the JV-505 form, Tyrone M. indicated he believed he was J.H.'s father and requested that the court enter a judgment of parentage and declare him J.H.'s presumed father. He stated he had told his friends, fiancée, adult son, a social worker, and police officers that J.H. was his son. He also represented that he saw J.H. every other day and changed his diapers and clothes. He fed him, read to him, taught him his numbers, and the two played together. Tyrone M. stated that every weekend J.H. went to the place where Tyrone M. refereed basketball. He gave mother money to purchase necessities on several occasions. Tyrone M. also reported J.H. had a relationship with his adult son.

Mother submitted a paternity questionnaire, which the juvenile court described for the record at the detention hearing. Mother identified Tyrone M. as J.H.'s father. Mother said Tyrone M. was not present at J.H.'s birth and he did not sign the birth certificate. She was neither married to Tyrone M. at the time of J.H.'s conception or birth, nor were they living together. But mother claimed Tyrone M. had held himself out to be J.H.'s father and provided support, although he had not received J.H. into his home. Mother's counsel explained that Tyrone M. visited "semi-consistently," but he and mother agreed on a place for visits to take place. Mother admitted she was married to someone else at the time of J.H.'s birth and she was still legally married to that man.

The court postponed a hearing on parentage until mother's husband could be given proper notice. Tyrone M. requested that the court find him to be J.H.'s presumed father, or, alternatively, a *Kelsey S.* father.[1] Later in July, DCFS conducted a prerelease investigation regarding Tyrone M. Tyrone M. had a history of drug use, but he claimed he had been sober for seven years. He also had a criminal history, which included a 1996 felony conviction for rape of a spouse by means of force or fear, with a resulting three-year prison

---

[1] *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*).

sentence. As a result of the conviction, he was required to register as a sex offender. Tyrone M. told DCFS he could provide J.H. with supervision and a safe home. He had moved into a larger apartment to have more space for J.H. DCFS did not recommend that J.H. be released to Tyrone M. at that time due to a lack of drug test results and his criminal history.

In August 2010, DCFS filed a jurisdiction and disposition report. As reflected in the report, Tyrone M. told DCFS he gave mother money for whatever J.H. needed. Tyrone M. stated: "So whatever necessities [J.H.] needed I made sure she had the money to get. I didn't go buy it but I did provide her with the money to get it. I would see my son just about on a daily basis. When he was with me I would make sure he was well taken care of; I played with him and I tried to teach him his numbers and how to read. In the report it says that I was in his life and providing for him. But then [mother] tried to say that he wasn't my son. But when it comes to my kids I don't play; I am a stickler for education. I have never denied that [J.H.] was my son. I have been in his life since birth and even before I found out that he was my son. [Mother] and I were friends and I was in her life as a support but one day we got to talking and I pulled her aside and told her that based on what she was saying it may be a possibility that I was his father. We were never together but we had a one night stand that resulted in my son. But when I found out he was mine I began to provide for him."

Tyrone M. admitted that George H. was "there for [J.H.] when he was born," but also stated that George H. beat mother when she was still pregnant with J.H.'s brother. Tyrone M. said he would do anything to get J.H. back. He conceded he had not completed a substance abuse rehabilitation program, but indicated that he quit using drugs on his own seven years earlier.[2]

George H. denied that he had beat mother. He said J.H. "practically stayed in [his] custody all the time" because mother was in school. George H. further claimed: "When I came home from prison [mother] was pregnant already and I took care of her and when [J.H.] was born I signed his birth certificate and loved him as if he were my own and to give him a good life. I have no idea who this Tyrone person is. This is all news to me because she told me the father didn't want anything to do with her or the baby." He also told DCFS: "I love both boys but I am here in prison and I have 3 more years to go. I will be home in 2013 but a lot can happen in that time. I think the

---

[2] Tyrone M. also told DCFS he had witnessed George H. being violent with mother on three occasions. At other times, mother told him about George H.'s violence, or he saw that mother had bruises when she brought J.H. to the basketball games Tyrone M. refereed. Tyrone M. did not believe the allegation that Frederick B. was violent with mother, and he also felt that mother had been misdiagnosed as bipolar. He knew that mother smoked marijuana to cope with domestic violence, but he did not know how much or how often.

boys should be placed in a home where they can be well taken care of and safe. I suggest my friend Jermaine [K.]. I don't have his information on me but I will write you and give you all of the information."

DCFS recommended that although J.H. and his brother could not safely be returned to their "parents," mother and Tyrone M. should receive reunification services. DCFS also recommended that the court deny George H. reunification services because he was incarcerated and was not scheduled to be released until 2013, after the end of the reunification period.

At a hearing in August 2010, Tyrone M. asked the court to order a DNA test so that he might assert his biological paternity of J.H. The court did not rule on the request, stating that it would "revisit that issue." At the next hearing in September 2010, Tyrone M. again requested that the court order DNA testing as to J.H. The court stated it would not order a DNA test at that point. In October 2010, the juvenile court adjudicated the petition. The court sustained a revised petition which contained no allegations regarding Tyrone M. or George H. Instead, the sustained petition asserted jurisdiction based only on the allegations that mother's drug use and her untreated mental and emotional problems prevented her from adequately caring for J.H. and his brother. The court permitted Tyrone M. to have monitored contact with J.H. and set a hearing to determine parentage. The court did not order Tyrone M. to participate in any services, but noted the DCFS recommendation that "in the event that you are going to request that you be considered the presumed father of [J.H.] that you participate in a parent-education course and also to submit to random drug testing." At this hearing, George H. requested that he be considered J.H.'s presumed father.

George H. subsequently submitted a JV-505 form regarding J.H. George H. represented that J.H. lived with him from J.H.'s birth in March 2008 until August 2009, and that he told family, friends, and acquaintances that he was J.H.'s father. George H. reportedly diapered, bathed, clothed, cradled, and sang to J.H., and did "everything a father does." George H. also stated he had provided financial and emotional support for J.H. J.H. had not met George H.'s family because they lived out of state, but George H. had sent pictures of J.H. to his family. George H. concluded: "I love [J.H.] dearly and want to play a significant role in his life. I wish to be designated the presumed father." In an interview with DCFS, George H. appeared to recant his earlier statements that he did not know Tyrone M., and that he was uninvolved in the domestic violence with mother. He explained: "I knew [J.H.] was not mine because she was already pregnant when I came home from prison. I took him as my own because I love kids. [Tyrone M.] was a good friend of mine . . . . I should have used better judgment (regarding the domestic violence with [mother]) but I ended up here. But now it is really

about the kids. I took good care of [J.H.] while I was there. I am 42 years old and things change in people's lives."

In early November 2010, the juvenile court held a hearing to determine paternity issues. Mother testified. Mother said she did not give Tyrone M. an honest answer about whether he was J.H.'s father because she was afraid of George H. It was only after George H. went to prison that she was able to "speak the truth about [J.H.'s] true parentage." Mother testified that because of her fear of George H., she and Tyrone M. "never really established to where he could communicate with [J.H.]; so there was never a bond built." Mother said she and Tyrone M. came to a mutual decision that he would not have much contact with J.H. However, mother said that Tyrone M. was undoubtedly J.H.'s father. Mother testified that before J.H. was born, she had a conversation with Tyrone M. suggesting that the baby might be his. Tyrone M. helped mother a little financially while she was pregnant. After J.H. was born, Tyrone M. gave her money for J.H. on a few occasions, and sometimes bought diapers. Tyrone M. did not assist her with prenatal care or go to doctor's appointments with her. Tyrone M. also did not ask that he be considered J.H.'s father or sue for paternity. But mother explained: "[T]here was conversations of him being recognized as the father. Before [George H.'s] incarceration, it was a secret that I carried with me. It wasn't until after [George H.] was incarcerated, and I didn't fear him anymore that it was able to be publicly spoken that he was [Tyrone M.'s] son. [¶] . . . [¶] . . . He gave me money every now and then. He did buy some Pampers, and, I mean, he does know [J.H.]. He has seen him and associated with him throughout the entirety of his life. He has known him. It was just a very close held secret as to who Tyrone really was to [J.H.]."

Mother also testified that George H. lived with her during the latter half of her pregnancy with J.H. Mother said George H. helped her, but she received more help from others. George H. was at the hospital during J.H.'s birth and he signed his name on the birth certificate. He attempted to support mother and J.H. for well over a year after J.H. was born. Mother testified that George H. diapered and bathed J.H. and gave him some affection. Mother had heard George H. identify J.H. as his son.

Tyrone M. also testified. He said he gave small amounts of money to mother between five and 10 times, and he also gave money to George H. for J.H. Mother definitively told him he was J.H.'s father soon after J.H.'s first birthday. Tyrone M. testified he knew George H. had signed J.H.'s birth certificate but he had suspicions that J.H. was his son. Even after mother admitted J.H. was Tyrone M.'s son, they kept it a secret from George H. because "[George H.] is very violent towards [mother]. In fear so that he would not be abused or hurt or whatnot, we kept that secret. [¶] I considered

at the time [George H.] to be a friend, but the thing is that friendship or not I was willing to tell him that he was my son. As I stated before in light of his abusiveness to [mother], I said nothing because she turned out to be the mother of my son; so I didn't want to see no harm come before her. We kept the secret." Tyrone M. again requested a DNA test.

The juvenile court found George H. to be J.H.'s presumed father. As to Tyrone M., the court concluded: "I understand that [Tyrone M.] is here today stating that he is the biological father of this child and that the mother is also stating that [Tyrone M.] is the biological father of this child. [¶] However, with respect to presumed father status a finding pursuant to Family Code 7611 would necessitate [Tyrone M.] showing that he has held himself out to be the father of the child and has openly accepted the child into his home. Through his own testimony, he has stated that he elected to keep this a secret, that he has had access to this child and knew about [mother's] pregnancy. I understand that he stated that he has periodically given some type of support, but it appears to this court that that was merely token contact. [¶] Additionally, this is a situation where the mother was pregnant, and he knew of the pregnancy. He had access to the family, and there's no indication that the mother attempted to thwart contact with [Tyrone M.], but the situation was that [George H.] believed that he was the father of [J.H.] and he acted in that capacity. [¶] For that reason at this time, the court will make a finding that [George H.] is the presumed father of this child . . . ."

The court declared Tyrone M. to be an "alleged biological father." The court also relieved Tyrone M.'s appointed counsel after she assisted him with his writ or appellate rights. However, at the request of J.H.'s counsel, the court ordered DCFS to continue arranging visits for J.H. with Tyrone M.

Tyrone M. timely filed this appeal.

## DISCUSSION

### I. *Tyrone M. Was Not Denied His Due Process Right to Raise His Paternity Status to Presumed Father*

On appeal, Tyrone M. contends the juvenile court violated his right to due process by denying him the opportunity to elevate his paternity status to presumed father. We disagree.[3]

---

[3] Respondent DCFS has declined to enter an appearance in this appeal. In a letter to this court, respondent informed us it did not make recommendations in the juvenile court on paternity issues and does not take a position on appeal.

## A. *Applicable Legal Principles*

■ " 'In dependency proceedings, "fathers" are divided into four categories—natural [or biological], presumed, alleged, and de facto.' [Citation.] A biological father is one whose paternity is established, but who does not qualify as a presumed father." (*In re J.O.* (2009) 178 Cal.App.4th 139, 146 [100 Cal.Rptr.3d 276].) "A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an 'alleged' father." (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15 [24 Cal.Rptr.2d 751, 862 P.2d 751] (*Zacharia D.*); see *In re Joseph G.* (2000) 83 Cal.App.4th 712, 715 [99 Cal.Rptr.2d 915] (*Joseph G.*) ["alleged biological father" is "a man who may be the father of a child, but whose biological paternity has not been established"].)

" 'Presumed father status ranks highest.' [Citation.] Presumed fathers are vested with greater parental rights than.alleged or biological fathers. [Citation.] '[O]nly a presumed . . . father is a "parent" entitled to receive reunification services under [Welfare and Institutions Code] section 361.5,' and custody of the child under Welfare and Institutions Code section 361.2." (*In re M.C.* (2011) 195 Cal.App.4th 197, 212 [123 Cal.Rptr.3d 856] (*M.C.*).)[4]

■ "Due process for an alleged father requires only that he be given notice and an opportunity to appear and assert a position and attempt to change his paternity status, in accordance with procedures set out in section 316.2. [Citation.] He is not entitled to appointed counsel or to reunification services." (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120 [53 Cal.Rptr.3d 437] (*Kobe A.*).)

Similarly, a biological father who is not also a presumed father has very limited rights. He is not entitled to custody of the child. (*Zacharia D., supra,* 6 Cal.4th at p. 451; *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596 [110 Cal.Rptr.2d 679] (*Francisco G.*).) Nor may he receive reunification services unless the court determines such services will benefit the child. (§ 361.5, subd. (a); *Francisco G.,* at pp. 596–597.)

■ To be a presumed father, a man must fall within one of the categories set forth in Family Code section 7611. Several of the categories relate to the man's status as the mother's husband, or his attempts to marry the mother. However, under section 7611, subdivision (d), a man may also be deemed a child's presumed father if he "receives the child into his home and openly holds out the child as his natural child." (See *Zacharia D., supra,* 6 Cal.4th at p. 449.)

---

[4] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

Under section 316.2, subdivision (a), at the detention hearing or as soon after as practicable, the juvenile court is to inquire as to the identity of all presumed or alleged fathers, and is to make inquiries of the mother relevant to the paternity of the child. Under section 316.2, subdivision (b), if after the juvenile court inquiry one or more men are identified as alleged fathers, each alleged father is to be provided notice of the dependency proceedings and that the proceedings could result in the termination of parental rights and adoption of the child. The notice is to include the JV-505 form, which gives the alleged father the opportunity to decline to participate in the proceedings, ask the court for blood or DNA testing to determine if he is the biological father of the child, request that the court enter a judgment of parentage, or ask the court to find him the presumed father of the child. (§ 316.2, subd. (b); *Kobe A., supra,* 146 Cal.App.4th at p. 1120.) As set forth in California Rules of Court, rule 5.635 (rule 5.635), which implements section 316.2, if there has been "no prior determination of parentage of the child, the juvenile court must take appropriate steps to make such a determination." (Rule 5.635(e); see *Kobe A.,* at p. 1121.)

Further, under rule 5.635(h): "If a person appears at a hearing in dependency matter . . . and requests a judgment of parentage on form JV-505, the court must determine: [¶] (1) Whether that person is the biological parent of the child; and [¶] (2) Whether that person is the presumed parent of the child, if that finding is requested."

B. *The Juvenile Court Provided Tyrone M. an Opportunity to Attempt to Change His Status from Alleged to Presumed Father*

Tyrone M. argues he did not have the opportunity to elevate his status to presumed father. The record does not support this claim. At the initiation of the case, mother identified Tyrone M. as J.H.'s father, and Tyrone M. received notice of the proceedings. At the detention hearing in July 2010, Tyrone M. filed a completed JV-505. In November 2010, the juvenile court held a hearing to determine J.H.'s parentage. Throughout the proceedings, Tyrone M. was represented by appointed counsel. At the November 2010 parentage hearing, he presented evidence: mother's testimony and his own. Thus, Tyrone M. received both notice and a hearing, in compliance with section 316.2. (*In re Paul H.* (2003) 111 Cal.App.4th 753, 761 [5 Cal.Rptr.3d 1] (*Paul H.*) [procedures set forth in § 316.2, subd. (b) and former rule 1413 (now rule 5.635) "provide an alleged father with the notice to which he is entitled and the means by which to 'assert a position and attempt to change his paternity status' "]; *In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1418 [286 Cal.Rptr. 239] [due process requires reasonable notice and hearing].) Tyrone M. received the opportunity to attempt to change his paternity status.

## C. *Substantial Evidence Supported the Juvenile Court's Presumed Father Findings*

To the extent Tyrone M. contends the juvenile court erred in finding he was not J.H.'s presumed father, we also disagree. We review a juvenile court's presumed parentage determination for substantial evidence. (*M.C., supra*, 195 Cal.App.4th at p. 213.)

■ Tyrone M. was never married to mother, did not cohabit with her, and did not attempt to marry her. He also had never completed a voluntary declaration of paternity. (Fam. Code, § 7611, subds. (a)–(c).) Thus, the only way for him to be considered the presumed father of J.H. under section 7611 was for him to have received J.H. into his home and openly held him out to be his natural child. (*Id.*, subd. (d).) "In determining whether a man has 'receiv[ed a] child into his home and openly h[eld] out the child' as his own [citation], courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental." (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1211 [34 Cal.Rptr.3d 215].)

There was substantial evidence Tyrone M. did not fall into this category. Tyrone M. testified that during the first year of J.H.'s life, he suspected J.H. was his son, but he did nothing to confirm his suspicions. He did not seek to have his name placed on J.H.'s birth certificate. He gave mother and George H. $5 or $10 on a few occasions to help with J.H.'s care. After J.H. turned one, and after George H. went to prison, Tyrone M. became somewhat more acquainted with J.H. In the JV-505 form, Tyrone M. stated he saw J.H. every other day, and on the weekends J.H. went to the location where Tyrone M. refereed basketball games. But there was no evidence that Tyrone M. received J.H. into his home, even after mother unequivocally admitted Tyrone M. was J.H.'s father, and George H. was in prison. Based on Tyrone M.'s statements in the JV-505 form and his hearing testimony, it was not clear when, if at all, Tyrone M. publicly acknowledged J.H. was his son. (*In re Sarah C.* (1992) 8 Cal.App.4th 964, 972–973 [11 Cal.Rptr.2d 414] [although biological father told a few friends and family he was the child's father, other evidence indicated he did not openly acknowledge child as his daughter or receive her into his home].) J.H. never lived with Tyrone M.

(*In re E.O.* (2010) 182 Cal.App.4th 722, 727 [107 Cal.Rptr.3d 1] [court properly found biological father was not presumed father where children had never lived with father and he had ignored them most of their lives].)

Even after mother acknowledged Tyrone M.'s paternity and George H. was in prison, Tyrone M. did nothing to legally establish his status as J.H.'s father. He never took legal action to seek custody of J.H. until the dependency proceedings began. (*In re A.A.* (2003) 114 Cal.App.4th 771, 786–787 [7 Cal.Rptr.3d 755].) Although there was evidence that Tyrone M. was developing a relationship with J.H., substantial evidence supported the trial court's ruling that Tyrone M. had not received J.H. into his home and openly held him out as his son. Thus, the juvenile court properly determined Tyrone M. was not a presumed father to J.H.[5]

Tyrone M. also asserts the trial court improperly found George H. was J.H.'s presumed father. As an "alleged father," Tyrone M. has no standing to challenge the presumed father finding as to George H. (*In re Eric E.* (2006) 137 Cal.App.4th 252, 262 [39 Cal.Rptr.3d 894] [alleged father had no standing to challenge finding that another man was presumed father]; *In re Alyssa F.* (2003) 112 Cal.App.4th 846, 855 [6 Cal.Rptr.3d 1] [alleged father is entitled to notice so that he may change his paternity status, but has no standing to challenge other orders].) This is not a case in which two men qualified to be presumed fathers, and the juvenile court was therefore required to weigh the competing presumptions. (*Jesusa V., supra*, 32 Cal.4th at p. 603.) However, even if Tyrone could challenge the court's presumed father finding as to George H., we would conclude substantial evidence supported the trial court's ruling. In addition to George H.'s statements provided in his JV-505 form and to DCFS, mother testified that George H. was present during J.H.'s birth, he signed J.H.'s birth certificate, he attempted to support mother and J.H. for over a year after J.H. was born while apparently living

---

[5] Although at one point Tyrone M. asked the juvenile court to find him to be a *Kelsey S.* father, he has not reasserted this argument on appeal. The argument is therefore abandoned. (*Dimon v. County of Los Angeles* (2008) 166 Cal.App.4th 1276, 1279, fn. 1 [83 Cal.Rptr.3d 576].) Further, even if not deemed abandoned, we would conclude the evidence did not support a finding that Tyrone M. was a *Kelsey S.* father. "To satisfy the *Kelsey S.* criteria, a child's biological father must show he promptly stepped forward to assume full parental responsibilities for his child's well-being, the child's mother or some third party thwarted his efforts to assume his parental responsibilities, and that he demonstrated a willingness to assume full custody of the child." (*M.C., supra*, 195 Cal.App.4th at p. 220.) Assuming, arguendo, that mother thwarted Tyrone M.'s attempt to achieve presumed fatherhood status because of her fear of George H., the evidence did not indicate that Tyrone M. made a full commitment to his parental responsibilities once the impediment of George H. was removed. Nor did Tyrone M. promptly take legal action to seek custody of J.H. once he knew J.H. was his son, or after George H. was imprisoned. (*In re Jesusa V.* (2004) 32 Cal.4th 588, 610–611 [10 Cal.Rptr.3d 205, 85 P.3d 2] (*Jesusa V.*); *In re Elijah V.* (2005) 127 Cal.App.4th 576, 583 [25 Cal.Rptr.3d 774] (*Elijah V.*).)

with them, and he showed J.H. affection while caring for him. He also told people J.H. was his son. This evidence was sufficient to support the juvenile court's finding under Family Code section 7611, subdivision (d) as to George H.

## II. *The Juvenile Court Should Have Determined Whether Tyrone M. Is J.H.'s Biological Father*

■ Tyrone M. also asserts the trial court erred in denying his requests for paternity testing. The juvenile court is not required to order genetic testing at the request of a party. Under rule 5.635(e)(2), the juvenile court must make a parentage determination and may order genetic tests to make the determination. But it may also make the parentage determination based on the "testimony, declarations, or statements of the alleged parents." (Rule 5.635(e)(3).)

■ However, whether or not the juvenile court ordered a paternity test, we agree that the court was required to determine whether Tyrone M. is J.H.'s biological father. Under rule 5.635(h), the juvenile court was required to determine not only if Tyrone M. was a presumed father (which it did), but also whether he was J.H.'s *biological* father. "This is a mandatory, not a discretionary, rule." (*In re Baby Boy V.* (2006) 140 Cal.App.4th 1108, 1118 [45 Cal.Rptr.3d 198] [error for court to deny alleged father's request for a paternity test to determine biological parentage]; see *In re Vincent M.* (2008) 161 Cal.App.4th 943, 959 [74 Cal.Rptr.3d 755] [dependency court has a duty to determine the biological parentage of a child when a man appears and requests paternity finding]; *Paul H., supra,* 111 Cal.App.4th at p. 761.) We know that the court did not make this determination because at the end of the paternity hearing it continued to identify Tyrone M. as an *alleged* biological father. (*Joseph G., supra,* 83 Cal.App.4th at p. 715 [alleged biological father is one who has not established biological paternity].)

In some cases, courts have found no error in the juvenile court's refusal to grant a paternity test where the results would be irrelevant. For example, in *In re Joshua R.* (2002) 104 Cal.App.4th 1020 [128 Cal.Rptr.2d 241] (*Joshua R.*), the juvenile court denied an alleged father's request for paternity testing because it found he would not qualify as a presumed father, even if he established biological paternity. (*Id.* at p. 1025.) The Court of Appeal determined this was not an abuse of discretion. The alleged father had no relationship with the child, had previously denied paternity, had never sought custody or visitation, and had waited until the child was five years old and involved in a third dependency proceeding, before requesting a paternity test. (*Id.* at p. 1026.) Although the court acknowledged that if the alleged father established his biological paternity the juvenile court would have the discretion to offer him reunification services based on a finding that it would benefit

the child (§ 361.5, subd. (a)), the court further concluded the juvenile court had "implicitly rejected that option when it found paternity irrelevant and denied [alleged father's] request for genetic tests. Underlying that decision is the implied finding the minor would not benefit from the provision of services to [alleged father.]" (*Joshua R.*, at p. 1026.) The appellate court held overwhelming evidence supported the juvenile court's implied finding. (*Ibid.*)

In contrast, in this case it is not clear that Tyrone M.'s biological paternity was irrelevant. Usually, it is not in the child's best interest for a biological father to receive reunification services when another man has been deemed the child's presumed father. (*Elijah V., supra*, 127 Cal.App.4th at p. 589; *Francisco G., supra*, 91 Cal.App.4th at p. 597.) "The purpose of services is to resolve the problems that led to the dependency and thereby reunify the family. . . . When the biological father has not parented the child and there is a conclusively presumed father who has, it is that man who should receive services because the child's best interests are served by being reunified with the person who has acted in a parental role, not the person who claims paternity by virtue of only a biological tie." (*Elijah V.*, at p. 589, citation omitted.)[6]

But here, J.H.'s presumed father, George H., was in prison and did not expect to be released before the end of any possible reunification period. (§ 361.5, subd. (a)(1)(B), (3), (4).) He did not suggest any family members who might be available to care for J.H. His imprisonment had removed him from J.H.'s life when J.H. was only a little over one year old. Mother was apparently no longer in a relationship with him and was involved with another man, Frederick B. In addition, George H. was convicted of inflicting corporal injury on mother. When mother thought the court had ordered DCFS to facilitate visits for George H. with J.H., mother protested, stating George H. had "put [her] through hell," abused her in front of J.H. on multiple occasions, and knocked J.H. out of her arms. This is not a case in which DCFS will be attempting to "reunify the family." (Cf. *Elijah V., supra*, 127 Cal.App.4th at p. 589.)

Further, the chances of a successful reunification between J.H. and George H. seem slim, given J.H.'s young age and George H.'s anticipated period of incarceration. (*Jesusa V., supra*, 32 Cal.4th at p. 601 [biological father's conviction and incarceration made successful reunification "all but impossible"]; see also § 361.5, subd. (a)(1)(B) [reunification period for

---

[6] We also note that Tyrone M.'s criminal record included a conviction for a violent felony within the meaning of Penal Code section 667.5, subdivision (c)(3). Thus, even if he were otherwise entitled to reunification services as a *presumed* father, the juvenile court would have the authority to deny him services under Welfare and Institutions Code section 361.5, subdivision (b)(12).

children under three years old is six months from the dispositional hearing, and should not exceed 12 months from the date child enters foster care]; § 361.5, subd. (a)(3), (4) [18- and 24-month extended reunification period].)

Moreover, although Tyrone M.'s conduct may not have risen to the level of presumed father, he had already developed at least some connection to J.H. According to mother and Tyrone M., J.H. saw Tyrone M. regularly and the two had "associated" throughout J.H.'s life. As soon as the dependency proceedings began, Tyrone M. appeared and requested custody. Unlike the alleged father in *Joshua R.*, Tyrone M. got involved in the dependency matter early, well before any consideration of termination of parental rights. DCFS reported that Tyrone M. had moved into a larger apartment so that he might have J.H. living with him, and Tyrone M. indicated J.H. had a relationship with his adult son. DCFS also recommended that George H. not be provided reunification services, but that the court order services for Tyrone M. Further, the court ordered DCFS to continue arranging visits between J.H. and Tyrone M. Even in *Joshua R.*, the court allowed that paternity can be relevant in a dependency proceeding "where an alleged father desires to confirm his biological connection with a child as a step toward initiating a relationship that could lead to presumed father status." (*Joshua R., supra*, 104 Cal.App.4th at p. 1027.) This was such a case.

On these facts, had the juvenile court determined Tyrone M. was J.H.'s biological father, whether the court would order reunification services for him under section 361.5, subdivision (a), was not a foregone conclusion. We also note that if Tyrone M.'s biological paternity is established, DCFS may consider his relatives as possible placements for J.H. (§ 361.3, subds. (a), (c)(2).) We cannot conclude that the juvenile court's failure to determine biological parentage pursuant to rule 5.635(h) was harmless. (*Paul H., supra*, 111 Cal.App.4th at p. 761.)

Rule 5.635(h) required that the juvenile court determine if Tyrone M. was J.H.'s biological father as part of the parentage determination, whether by ordering genetic tests or deciding based on the other evidence presented at the parentage hearing. The juvenile court's parentage finding as to Tyrone M. was incomplete, and as such, must be reversed. We therefore remand this matter to the juvenile court to determine whether Tyrone M. is J.H.'s biological father. (*M.C., supra*, 195 Cal.App.4th at p. 223 [where court failed to resolve presumptions as between three presumed parents, order incomplete and remanded].)

Finally, Tyrone M. asserts he may in the future file a section 388 petition in a further attempt to elevate his paternity status to that of presumed father. We agree that he may file a section 388 petition seeking reconsideration of the

juvenile court's presumed father finding if new evidence or changed circumstances warrant such a motion. (*Zacharia D., supra*, 6 Cal.4th at pp. 454–455.) Although Tyrone M. suggests the juvenile court's comments at the paternity hearing eliminated his ability to do so, we do not read the court's statement that Tyrone M. had "no legal standing" so broadly. The juvenile court was not considering whether in the future Tyrone M. could file a section 388 petition. There was no finding or ruling on this point for us to review.

## DISPOSITION

The juvenile court's parentage order is affirmed with respect to the finding that Tyrone M. is not J.H.'s presumed father. However, the order is incomplete in that it failed to determine whether Tyrone M. is J.H.'s biological father. The order is therefore reversed in part and the matter is remanded for the juvenile court to make the proper determinations pursuant to California Rules of Court, rule 5.635.

Rubin, J., and Flier, J., concurred.