Filed 4/22/22  W.B. v. Super. Ct. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| W.B.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF<br>SAN BERNARDINO COUNTY,<br><br>        Respondent;<br><br>SAN BERNARDINO COUNTY<br>CHILDREN AND FAMILY SERVICES,<br><br>        Real Party in Interest. | E078391<br><br>(Super.Ct.No. J288309)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Lynn M. Poncin, Judge.  Petition denied.

Harold Gun Lai, Jr., for Petitioner.

No appearance for Respondent.

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Real Party in Interest.

1

In this dependency writ, an alleged, nonbiological father challenges the juvenile court's order denying him presumed father status over a one-year-old child he cared for and initially believed was his. We reject his arguments and deny the petition.

I.

BACKGROUND

*Investigation and Detention*

San Bernardino County Children and Family Services (CFS) began investigating the welfare of D.B. (the child) following three referrals based upon allegations of general neglect and emotional abuse by C.P. (mother) and W.B., the petitioner and alleged father.[1] Mother had an extensive CFS history and had other children previously removed due to substance abuse, domestic violence, and mental health issues. Parental rights were terminated in those cases. The allegations in the referrals included mother regularly using drugs without W.B. intervening, the child not gaining weight and suffering from poor hygiene, and domestic violence between mother and W.B.

A crime report generated a few days after the child's birth stated that W.B. did not want mother to have the child at the hospital for fear that she would be contacted by law enforcement and arrested for her felony warrant. According to the crime report, W.B. claimed to not know mother's whereabouts but brought the child out for deputies to determine whether she needed medical attention.

---

[1] Although mother filed a notice of intent to file a writ petition pursuant to California Rules of Court, rule 8.452, we dismissed her case for failing to timely file a petition. (Welf. & Inst. Code, § 366.26, subd. (*l*); *Roxanne H. v. Superior Court* (1995) 35 Cal.App.4th 1008, 1012-1013.)

CFS set up a child and family team meeting, during which mother and W.B. agreed to a voluntary family maintenance plan. However, when social workers attempted to meet with the family to discuss the case plan, W.B. was upset and told them that mother and the child were not home and that he did not know their whereabouts. He said he would not agree to participate in services because mother's issues were not his issues.

At mother's last known address, W.B.'s mother told the social worker that mother had moved to a friend's home. W.B. confirmed that mother had moved and said it was because she was upset with him. He denied that mother used drugs and said he had been "clean and sober" for three years.

The social worker confirmed that mother had a felony warrant for her arrest. Additionally, W.B. had a criminal history, was uncooperative, and was allegedly a domestic abuser. Therefore, the social worker requested and obtained a detention warrant.

In March 2021, CFS filed a dependency petition for the child pursuant to Welfare and Institutions Code section 300, subdivisions (b)(1) (failure to protect), (g) (whereabouts unknown), and (j) (half siblings previously adjudged dependents). The petition included allegations of domestic violence between mother and W.B., an unsafe lifestyle, substance abuse by mother and W.B., mother's mental health issues, mother's whereabouts being unknown, and the termination of mother's parental rights to half siblings.

At the March 2021 detention hearing, the juvenile court ordered that the child be detained upon apprehension. It ordered supervised visitation for W.B. for a minimum of one time a week for two hours.

*Jurisdiction and Disposition*

W.B. was interviewed on two occasions for the jurisdiction/disposition report. During the first interview, W.B. said he would "do anything to get [his] daughter" back. He reported not knowing mother's whereabouts and he did not want to participate in reunification services. He believed he was "being punished because [he] did not call [the] hospital." He claimed that mother "blew it" and said he could handle it if the child were placed with him, as there were other children in the home and he had plenty of support. Rather than show concern when mother absconded with the child, W.B. asked the social worker if mother could just "go away" because she was having a nice time with their baby. He reported that mother's sisters knew mother and child were fine, but that they would not disclose their location.

At the second interview, W.B. denied any domestic violence with mother but said that mother on one occasion threw things at him, causing him to grab her arms. W.B. denied having an unsafe lifestyle because he took care of the child, had cared for nieces and nephews in the past, had all the provisions for the child, and set up her doctor appointments. He provided documentation indicating the child had been taken to the doctor.

W.B. reported that there was no reason to believe the child was not his. He said he loved the child and went through the pregnancy with mother. He claimed he took the

4

child to a doctor's appointment and was trying to get the child's birth certificate. Additionally, W.B. stated that he and mother were in a relationship when the child was conceived. He indicated that mother had been living in the home for two years, and he believed the child was his. He said he would love the baby whether she was his or not, but he was willing to take a paternity test.[2]

According to a report filed for a May 2021 hearing, the child had been located and placed in CFS custody in late March 2021. The child had been taken to a hospital, where she tested positive for amphetamines. Mother was in custody at a rehabilitation center that the sheriff's department operated for the purpose of housing inmates undergoing rehabilitation.

Mother was interviewed about paternity. She said she was in a relationship with W.B. when the child was conceived and that W.B. was the child's father. She stated W.B. was present at the birth. She claimed that W.B. was the only person who could be the father. Mother denied all of the allegations and said she did not use drugs during her pregnancy but admitted to using drugs some months after the child had been born. She denied knowing that CFS or law enforcement were looking for her.

In August 2021, the social worker spoke to the child's caregiver regarding visits. She reported that because of the distance of the visits, W.B. was required to confirm the visits a week in advance or ask for accommodations. She stated although W.B. initially

---

[2] Another potential father, L.S., came forward and inquired about a paternity test. A third man, D.K., who was in jail, also came forward claiming to be the child's father. Paternity test results indicated that D.K. was the child's biological father.

attended all of the visits, he began to miss one or two visits a month. During the visits, W.B. would feed the child, change her diaper, talk to her, and engage with her. The caregiver reported no concerns.

The child was placed with D.K.'s relatives, Mr. and Mrs. D., in October 2021. Mrs. D. stated that W.B. would occasionally visit the child but did not exhibit any "parental capacity" during the visits. She said that when the child was upset or hungry, W.B. would hand her back to her. She disclosed that during a visit in mid-October, W.B. told her that mother was at his house and that he wanted her to get custody of the child because she deserved an opportunity to parent the child.

In mid-November 2021, the social worker mailed out consent forms and other documents to enroll W.B. in services. As of early December, she had yet to receive the required documents back from W.B. W.B. also continued to fail to appear for drug testing.

CFS recommended that the court find W.B. to be a nonparty and not entitled to services and to terminate all visitation between him and the child because he had yet to engage in services, was uncooperative with CFS, and did not believe he needed services. Furthermore, of the only two drug tests W.B. had taken, one came back positive for amphetamines. Additionally, W.B. continued to advocate for and engage with mother.

*Jurisdictional Hearing – Testimony Regarding Paternity*

At the contested jurisdictional/dispositional hearing in January 2022, the court first heard testimony from W.B. on the issue of whether he should be declared a presumed father. He testified as follows.

6

Mother received very little prenatal care. W.B. did not attend any of the appointments with mother because he was at work. He considered himself to be the child's father and was present for her birth at his home. He delivered the child with the help of some friends. As soon as the child was born, he called paramedics and the fire department to assess the child and they determined she was healthy. After the child's birth, she and mother stayed at his home. He changed the child's diapers, fed her, cradled her, and rocked her to sleep. W.B. supplied the diapers, made sure the child was warm, and had a crib for her as well as everything a baby needed. The child was with him for roughly six weeks before she was removed from his home.

About four days after the child's birth, CFS got involved due to an anonymous call about the child being malnourished. W.B. denied the allegation. CFS assessed the child and the home without removing her. W.B. took her to the doctor. He attempted to get a birth certificate for the child because it was something she needed.

W.B. tried to visit the child every week since February 2021. He held the child during the entire two-hour visits, showed her things at the park, changed her, and fed her. The child did not become fussy at all. W.B. believed the child recognized him and that there was a close bond between them based upon their "togetherness, [their] morale with each other, the happiness with each other." Since the child's removal, he provided diapers, bought a few gifts, and brought some things so she could learn. Although he was not the child's biological father, it did not change his feelings toward her. He always referred to the child as his and held her out as his daughter.

7

The court stated it was mindful of cases such as *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 and *Adoption of Baby Boy W.* (2014) 232 Cal.App.4th 438, and it went through a lengthy analysis before concluding W.B. had not met his burden to establish himself as a presumed father. The court found W.B. was not credible during his testimony. It noted W.B.'s testimony was implausible with respect to the frequency of visitation as well as mother's prenatal care. Specifically, the court observed that it was impossible for W.B. to have visited the child one time a week since February 2021 as mother and the child were missing for quite a while. Also, the court stated that in the detention report, it was reported that mother did not receive prenatal care.

The court voiced concern that W.B. knew mother was using drugs but did not intervene. The court further observed that W.B. was either not concerned about the child's whereabouts or lied to CFS and protected the child's whereabouts. It concluded that W.B. failed to cooperate with services and continued to advocate for mother, placing the child at risk of future harm. Therefore, the court found that although W.B. acknowledged the child as his own, he did not act throughout the case as one who assumes parental responsibilities as fully as he could have under the circumstances.

The court deemed W.B. to be a nonparty and dismissed the allegations pertaining to him. It found the other allegations to be true and declared the child a dependent of the court. The court removed the child from her parents' custody, denied services to both

8

mother and D.K., and set a hearing pursuant to Welfare and Institutions Code section 366.26.[3]

## II.

## DISCUSSION

W.B. argues the juvenile court erred in finding he was not the child's presumed father.[4]  We disagree.

A.    *Relevant Law*

The dependency system recognizes four classes of fathers:  alleged, natural (or biological), presumed, and de facto.  (*In re J.H.* (2011) 198 Cal.App.4th 635, 644.)  An alleged father might be the father but has not yet been established to be either the biological father or a presumed father.  (*Ibid.*)  A biological father is one whose paternity

---

[3]  Because the court set a selection and implementation hearing, the order was not appealable and instead had to be challenged by writ petition.  (Welf. & Inst. Code, § 366.26, subd. (*l*); *In re Tabitha W.* (2006) 143 Cal.App.4th 811, 815-817.)  The court, however, advised W.B. of his right to appeal, advising him that he had 60 days to file a notice of appeal.  He was not advised of the need to timely file a notice of intent to file a writ petition.  (Cal. Rules of Court, rule 8.450(e)(4)(A).)  Therefore, on January 24, 2022, we issued an order construing W.B.'s notice of appeal as a notice of intent.

[4]  A writ petition challenging an order setting a Welfare and Institutions Code section 366.26 hearing must comply with the requirements set forth in California Rules of Court, rule 8.452.  Among the requirements, a petition must be accompanied by a memorandum that includes a statement of "each point under a separate heading or subheading summarizing the point and support[ing] each point by argument and citation of authority."  (Cal. Rules of Court, rule 8.452(b)(2).)  In this case, W.B.'s petition is woefully deficient as none of his argument contains citation to authority.  Where a writ petition is procedurally deficient, a reviewing court may summarily deny it.  (See *Anthony D. v. Superior Court* (1998) 63 Cal.App.4th 149, 157.)  However, a writ petition "must be liberally construed" by the appellate court.  (Cal. Rules of Court, rule 8.452(a)(1).)  While W.B.'s petition is conclusory and deficient, we are not summarily denying it because of the importance of the issue.

is established but who does not qualify as a presumed father. (*Ibid*.) A presumed father falls into one of several statutory categories in Family Code section 7611, several of which relate to the man's status as the mother's husband, or his attempts to marry the mother. (*In re J.H.*, at p. 644.) A de facto father is one who has assumed the day-to-day role of a parent for a substantial period of time. (*In re E.O.* (2010) 182 Cal.App.4th 722, 726)

" ' "Presumed father status ranks highest." ' " (*In re J.H.*, *supra*, 198 Cal.App.4th at p. 644.) "Presumed father status entitles the father to appointed counsel, custody (absent a finding of detriment), and a reunification plan." (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.) Among the statutory categories for presumed father status, only one is at issue here. Under Family Code section 7611, subdivision (d) (section 7611(d)), a man is a presumed father if he "receives the child into [his] home and openly holds out the child as [his] natural child."

Section 7611(d) "requires something more than a man's being the mother's casual friend or long-term boyfriend; he must be 'someone who has entered into a familial relationship with the child: someone who has demonstrated an abiding commitment to the child and the child's well-being' regardless of his relationship with the mother." (*In re D.M.* (2012) 210 Cal.App.4th 541, 553.) "There are no specific factors that a trial court must consider before it determines that a parent has 'received' a child into the home and has established a parental relationship. 'In determining whether a man has "receiv[ed a] child into his home and openly h[eld] out the child" as his own [citation], courts have looked to such factors as whether the man actively helped the mother in prenatal care;

10

whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental." (*W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 145-146.)

"No single factor is determinative; rather, the court may consider all the circumstances when deciding whether the person demonstrated a parental relationship by holding out the child as his or her own and assuming responsibility for the child by receiving the child into his or her home." (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 774.) "Presumed parent status is afforded only to a person with a fully developed parental relationship with the child; . . ." (*Id.* at p. 776, italics omitted.)

W.B., as the man claiming status as a presumed father, bears the burden of proving the facts in support of his entitlement to that status by a preponderance of the evidence. (*In re J.O.* (2009) 178 Cal.App.4th 139, 147, abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622.) If the presumption under section 7611(d) is established, it "may be rebutted in an appropriate action only by clear and convincing evidence." (Fam Code, § 7612, subd. (a).) Where, as here, the juvenile court finds that the person seeking presumed parent status has failed to meet his burden of proof, the question on appeal, as in all failure of proof cases, is " 'whether the evidence compels a finding in favor of the

11

appellant[ ] as a matter of law.' " (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1163; accord, *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527-1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4.) "Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.*, at p. 1528.)

We review a juvenile court's determination of presumed father status for substantial evidence. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1650.) If there is substantial evidence to support the findings of the juvenile court, we uphold those findings. (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or order is not supported by substantial evidence. [Citation.]" (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

B.      *Analysis*

Sufficient evidence supports the juvenile court's finding that W.B. did not meet the requirements for being deemed the presumed father under section 7611(d). The juvenile court was not required to accept W.B.'s testimony, and in fact, found his testimony not credible. (See *In re L.L.* (2017) 13 Cal.App.5th 1302, 1310 [in reviewing a

12

juvenile court's finding as to whether a person is a presumed parent, we "do not reweigh the evidence or credibility of witnesses"].) The evidence indicates that W.B. did not demonstrate an "abiding commitment" to the child nor a fully developed parental relationship with her. (*In re D.M.*, *supra*, 210 Cal.App.4th at p. 553; see *R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 776.)

While W.B. provided a worksheet indicating his apparent intent to request a birth certificate on behalf of the child, there is no evidence he took legal action—prompt or otherwise—to obtain custody of the child. To the contrary, when the child was born, he did not attempt to seek sole custody of the child despite the fact that mother's other children had been removed, and that he knew she was using drugs and had a felony warrant for her arrest. (See *In re J.H., supra,* 198 Cal.App.4th at p. 647 [alleged father "did nothing to legally establish his status" and "never took legal action to seek custody . . . until the dependency proceedings began"].) W.B. even assisted mother in actively trying to conceal her whereabouts from the authorities by having a home birth. When social workers went to the home on February 19, 2019, W.B. claimed that mother had left the home with the child, he did not know where she was, and her issues were not his issues. He did not contact the police or make a referral to CFS. When mother absconded with the child, he did not contact the police to report the child was missing. As the juvenile court observed, he was either unconcerned about the child's whereabouts or he lied to CFS and protected the child's whereabouts, demonstrating that he did not act as a father and utilize his best efforts to be protective of the child. (See *Martinez v. Vaziri* (2016) 246 Cal.App.4th 373, 384-385 [" ' "[T]he premise behind the category of

presumed [parent] is that an individual . . . has demonstrated a commitment to the child and the child's welfare" ' "].)

Although W.B. was permitted to visit the child once a week, W.B.'s record of visitation was inconsistent, despite his testimony to the contrary. (See *In re A.A.* (2003) 114 Cal.App.4th 771, 787 [biological father was not a presumed father; among other things, he "just let contact with the minor slide"].) He did not act parental during the visits and would hand the child back to the caregiver whenever she was hungry or upset. "The law does not require children to wait so long for parents to become sufficiently interested . . . ." (*In re Marcos G.* (2010) 182 Cal.App.4th 369, 391.)

W.B. relies on a claim that the child lived with him for at least the first 30 days after her birth and he considered her his own. However, "[a] child's physical presence within the alleged father's home is, by itself, insufficient" under section 7611(d) to constitute " 'receipt of the child into [the man's] home . . . .' " (*W.T. v. S.T.*, *supra*, 20 Cal.App.5th at p. 145.) Even "a caretaking role and/or romantic involvement with a child's parent" is insufficient to establish presumed fatherhood. (*R.M. v. T.A.*, *supra*, 233 Cal.App.4th at pp. 776-777.) Instead, the record must reflect substantial evidence of an "established" and "fully developed parental relationship." (*Id.* at pp. 780-781; see *Martinez v. Vaziri*, *supra*, 246 Cal.App.4th at pp. 384-385 ["The critical distinction is not the living situation but whether a parent-child relationship has been established"].) When combined with all the other evidence, the kind of temporary, incidental care that was provided in this case was insufficient to establish presumed father status.

W.B. further states, "[t]he court seemed to focus on the period after mother took the minor and period minor was detained by CFS." Focusing on such a period, however, is entirely proper. In deciding whether an individual has attained presumed father status, the juvenile court must consider his conduct "*before and after* the child's birth." (*Adoption of Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) Presumed father status is granted based on a commitment toward developing a "substantial familial relationship to the child." (*In re Sarah C.* (1992) 8 Cal.App.4th 964, 975.) W.B.'s lack of a commitment to parenting responsibilities during the period the court focused on is highly relevant to the presumed father analysis. (*In re Spencer W.*, *supra*, 48 Cal.App.4th at pp. 1653-1654.)

In sum, W.B. cannot establish that the evidence he offered to support his claim for presumed father compelled a finding in his favor as a matter of law.

III.

DISPOSITION

The petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
J.

We concur:


FIELDS _____
   Acting P. J.


MENETREZ _____
    J.

15