Filed 2/17/26  In re M.F. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.F., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>             v.<br><br>ALEX S.,<br><br>        Defendant and Appellant. | G065881<br><br>(Super. Ct. No. 21DP1181)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, June Jee An, Judge. Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, and Debbie Torrez and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

Alex S. (Father) appeals from an order terminating his parental rights to his son, asserting the juvenile court erred in rejecting the parental-benefit exception to termination. The record supports the court's finding that the exception does not apply. We therefore affirm.

FACTS

After briefly dating Father in 2017, M.L. (Mother) became pregnant. She gave birth to M. in 2018. Father did not think M. was his child, but nevertheless cared for M. for brief periods when he was a toddler and sent money for the child's support. Mother also left M. in Father's care for an extended period from summer 2020 to summer 2021.

In 2021, when back in Mother's custody, M. ran across a four-lane street and was almost hit by a car. Mother was arrested for child endangerment and for being under the influence of methamphetamine. Father and another man were identified as the child's "alleged" fathers but could not be located.

The Orange County Social Services Agency filed a Welfare and Institutions Code[1] section 300 petition, citing Mother's inappropriate supervision of M., her unresolved substance abuse and mental health issues, and the alleged fathers' unknown whereabouts. M. was temporarily detained and placed with local foster parents.

A week later, Father reached out to the Agency about M., and the juvenile court appointed counsel for him and authorized paternity testing. But Father stopped communicating with the Agency after it asked about his extensive criminal history, which includes robbery and grand theft.

_____

[1] All further statutory references are to this code.

2

The juvenile court sustained the jurisdictional petition and granted reunification services to Mother. However, she made minimal progress, and Father failed to respond to Agency outreach or complete a paternity test. In mid-2022, the court terminated services and set a section 366.26 hearing.

Later that year, paternity testing confirmed Father is M.'s biological father. The Agency worked to arrange visitation, and Father's visits with M. went well. Around that same time, M. was placed with his maternal aunt, and he thrived in her care.

In 2023, Father filed a request to be recognized as M.'s presumed father, but he later withdrew the request. Meanwhile, his visits with M. became inconsistent, and the Agency terminated his visitation referral for lack of communication.

At the .26 hearing that summer, the juvenile court chose legal guardianship as M.'s permanent plan and provided Father with supervised visitation. M. and Father spoke on the telephone multiple times a week, and M. visited Father for the holidays. M.'s aunt described these visits as positive and observed M. was happy during his visits.

In early 2024, when M.'s aunt left the child unsupervised with Father and his girlfriend, Father was arrested and charged with attempted murder, assault with a firearm, child cruelty, and other offenses. He remains incarcerated and will be eligible for parole in 2029 or 2030.

After that, Father called M. from prison multiple times a week. These calls were positive but brief due to M.'s young age and short attention span. Meanwhile, M. continued to thrive in his aunt's care, voicing that he wanted to stay with her and viewed her as his mother.

At a second .26 hearing in 2025, Father testified about his special bond with M., asserting that terminating his parental rights would be detrimental to M. The Agency argued for freeing M. for adoption, noting Father had not risen to presumed parent status and could not establish the parental-benefit exception to termination given his inconsistent relationship with M. M.'s counsel joined in that argument.

The juvenile court found the parental-benefit exception does not apply, terminated parental rights, and placed M. for adoption. It noted that although Father supported M. as much as possible and was a "loving parent," their relationship did not rise to the level necessary to justify a less permanent plan.

## DISCUSSION

## I.

### FATHER HAS STANDING TO APPEAL

As a preliminary matter, we must address the Agency's argument that Father lacks standing to appeal the termination order because he never rose to "presumed father" status.

"The dependency statutes distinguish between the rights of alleged, biological, and presumed fathers. [Citation.] An alleged father is one who has not established paternity. [Citation.] A biological father is one who has established paternity but has not achieved presumed father status. [Citation.] A presumed father is one who satisfies certain enumerated statutory criteria, such as being married to the mother of the child or receiving the child into his home and holding the child out as his." (*In re G.R.* (2024) 106 Cal.App.5th 96, 99 (*G.R.*).)

A presumed father has greater rights in dependency proceedings than alleged or biological fathers. (*In re J.H.* (2011) 198 Cal.App.4th 635,

4

644.) "Unless and until an alleged father becomes a presumed father, he has no rights to custody, reunification services, or visits." (*G.R., supra,* 106 Cal.App.5th at p. 99.)

The Agency contends that because Father did not elevate himself to presumed father status at any point in the case, he has no standing to challenge the termination order. We disagree. It may be true that "an alleged biological father *who is not a party of record* in the dependency court has no standing to appeal an order terminating parental rights." (*In re Joseph G.* (2000) 83 Cal.App.4th 712, 716, italics added.) However, where, as here, a biological father appears in the case and asserts a position, he has standing to appeal. (*In re Baby Boy V.* (2006) 140 Cal.App.4th 1108, 1116–1117.)

II.

THE PARENTAL-BENEFIT EXCEPTION DOES NOT APPLY

We therefore turn to the merits of Father's appeal. Citing his special bond with M., Father asserts the juvenile court erred in finding the parental-benefit exception to termination does not apply. While we appreciate Father's connection with M., we see no error in the ruling.

When a juvenile court determines a child will likely be adopted, it is required to terminate parental rights unless an exception to adoption applies. (§ 366.26, subd. (c)(1).) One such exception is the parental-benefit exception. (*Id.*, subd. (c)(1)(B)(i).) To trigger the exception, a parent must prove three elements by a preponderance of the evidence: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631, 636 (*Caden C.*).) We review the first two elements for substantial evidence but review the third for abuse of discretion. (*Id.* at pp. 639–640.)

5

The Agency does not dispute Father established the first element of regular visitation and contact.

As for the second element—a beneficial relationship—Father made a heartfelt case for his bond with M., who clearly enjoyed his visits with Father. But the record reflected no more than that. M. only lived with Father as a toddler. His contact with Father in recent years was primarily telephonic, and those interactions were often brief due to the child's young age and attention span. Father had no recent, significant role in M.'s life outside of those interactions.

"To satisfy [the second] element, parents 'must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits' [citations], they must establish a substantial, positive, emotional attachment between them and the child." (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 816 (*Andrew M.*); see *In re Katherine J.* (2022) 75 Cal.App.5th 303, 318 [a beneficial relationship requires "more than the incidental benefit a child gains from any amount of positive contact with" the parent during visits].) Substantial evidence shows the bond between Father and M., while positive, did not rise to that level.

The third element—detriment—turns on "whether the harm of severing the [parental] relationship outweighs 'the security and the sense of belonging a new family would confer.'" (*Caden C., supra,* 11 Cal.5th at p. 633.) Conversely, "does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]'" (*Ibid.*)

Father articulates no specific harm M. would suffer from the termination of parental rights, aside from the loss of having a father figure. "There is no question that there are benefits in continued visits with loving

6

parents to which the child has some substantial attachment. Yet to justify withholding the 'security,' 'stability,' and "'sense of belonging a new family would confer'" [citation], the parents . . . must prove some type of harm beyond the fact that their loving visits would cease." (*Andrew M.*, *supra*, 102 Cal.App.5th at p. 820.) Father did not do so here. The juvenile court therefore did not abuse its discretion when it found the scales tipped in favor of adoption.

DISPOSITION

The order is affirmed.

SCOTT, J.

WE CONCUR:

MOORE, ACTING P. J.

SANCHEZ, J.