Filed 2/26/18

CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.A. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E067604 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J266868 & J266869) |
| v. | OPINION |
| A.A. et al., | |
| Defendants and Appellants; | |
| M.Z. | |
| Defendant and Respondent | |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Reversed in part; affirmed in part.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant A.A.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant F.A.

1

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Respondent M.Z.

Leslie A. Barry, under appointment by the Court of Appeal, for minors M.A. and E.A.

Michelle Blakemore and Jean-Rene Basle, County Counsel, Danielle E. Wuchenich and Kristina M. Robb, Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court found E.A. (Minor, a female, born in July 2008.) and M.A. (a male, born in May 2015) came within the court's jurisdiction. (Welf. & Inst. Code, § 300, subds. (a), (b) & (j).)[1] The court ordered Minor be removed from the custody of F.A. (Mother). The court ordered Minor be placed in the custody of A.A. (Stepfather), who was a nonoffending, noncustodial, presumed father. The juvenile court found M.Z. (Bio-Father), Minor's biological father, was a *Kelsey S.*[2] father, thus creating three parents for Minor. (Fam. Code, § 7612, subd. (c)). The juvenile court ordered Minor have visits with Bio-Father.

Mother and Stepfather raise three issues on appeal: (1) the court's finding that Bio-Father is a *Kelsey S.* father is barred by collateral estoppel; (2) evidence does not support the finding that Bio-Father is a *Kelsey S.* father; and (3) the juvenile court erred

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

[2] *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).

by not terminating jurisdiction over Minor.  Additionally, Mother asserts the juvenile court erred by granting visitation to Bio-Father.  We reverse in part and affirm in part.[3]

## FACTUAL AND PROCEDURAL HISTORY

A.    BACKGROUND

Mother and Stepfather married in 1992.  Mother and Stepfather shared two adult children.[4]  Mother and Stepfather separated in 2006.  From 2006 to 2008, Mother was in a relationship with Bio-Father.  In late 2007, Mother told Bio-Father she was pregnant.  They decided to terminate the pregnancy.  In early January 2008, Bio-Father took Mother to an abortion clinic.  Bio-Father believed Mother had the abortion. Mother did not have the abortion.  Mother and Bio-Father's relationship ended in January 2008.  In 2008, Mother and Stepfather resumed their marital relationship. Stepfather helped to raise Minor.

In 2010, two years after their relationship ended, Mother called Bio-Father, who was living in Texas, and told him they had a child—Minor.  Bio-Father returned to California with the intention of being part of Minor's life.  Bio-Father spent approximately two weeks with Minor.  However, when Bio-Father did not show an interest in having a relationship with Mother, Mother avoided Bio-Father.  At that point,

---

[3] M.A.'s father is not a party to the appeal.  Since appellants' briefs do not address M.A., we deem the appeal abandoned as to any issues concerning M.A. (case No. J266868).

[4] Mother's third adult child, D.A., is discussed *post*.

Bio-Father initiated a family court case. Also in 2010, in Nevada, Mother married V.M.N. Mother and V.M.N. shared an adult child, D.A.

In June 2012, in the family court proceedings initiated by Bio-Father, and involving Mother and Stepfather, the family court explained the issue before it was "whether or not either of the gentlemen involved in this case can establish a presumption of paternity under [Family Code section] 7611." Bio-Father argued that the court should apply *Kelsey S.*[5] Stepfather asserted adoption cases, such as *Kelsey S.*, are different from paternity cases, and thus *Kelsey S.* was inapplicable. The family court agreed with Stepfather.

The family court found Stepfather met the criteria of a presumed father under Family Code section 7611, subdivision (a), and Bio-Father did not meet the criteria for a presumed father under Family Code section 7611, subdivision (d). The family court denied visitation between Minor and Bio-Father and denied custodial rights to Bio-Father. Bio-Father spoke to multiple attorneys about appealing the family court's judgment, but he was told "that [he] had no chance."

Mother and Stepfather separated in 2013. Following the 2013 separation, Stepfather agreed to pay $1,500 in child support for Minor and he visited her approximately once a month.

---

[5] "To qualify as a *Kelsey S.* father, a biological father must show he promptly stepped forward to assume full parental responsibilities for the child's well-being, including a financial, emotional or other commitment; the child's mother thwarted his efforts to assume his parental responsibilities; and he demonstrated a willingness to assume full custody of the child." (*In re Jason J.* (2009) 175 Cal.App.4th 922, 932.)

B.    DETENTION

On August 17, 2016, Minor had a bite-shaped bruise on her arm.  Mother bit Minor.  Mother struck Minor's legs with an umbrella causing bruises, and has struck Minor with a belt.  Minor is spanked daily, and the spankings cause bruises.  Mother explained that she spanked Minor because Minor was "constantly interrupting and trying to get other people's attention."  Mother admitted spanking Minor with her hand, a belt, and a stick.  Mother admitted biting Minor.  Mother said it happened when Mother was frustrated, and she regretted it.  Mother said she struck Minor with the umbrella " 'out of desperation.' "  Mother was arrested for inflicting cruel or inhumane corporal punishment.  (Pen. Code, § 273d.)

Minor was placed with Stepfather.  M.A. was placed with his adult half-sibling, V.A.  The juvenile court ordered Minor and M.A. be detained from Mother.

C.    Request to Change a Court Order

Bio-Father spoke with a social worker from San Bernardino County Children and Family Services (the Department).  Bio-Father explained that he "has been trying to get involved" in Minor's life since he first learned about Minor.  After Minor was detained, Bio-Father went to Stepfather's home and insisted that Bio-Father had a "right to the child."

At a hearing on September 12, 2016, Mother's attorney informed the juvenile court that the family court had previously denied Bio-Father visitation with Minor as well as custody of Minor.  The juvenile court found Bio-Father had no status in relation

5

to Minor and ordered Bio-Father to stay away from Minor, Minor's school, and Stepfather's home, and to have no contact with Minor.

On October 27, Bio-Father filed a request to change the court's no-contact order. (§ 388.) Bio-Father explained that Mother did not inform D.A. that V.M.N. was D.A.'s father until D.A. was approximately 15 or 16 years old. Bio-Father asserted Mother would also hide Bio-Father's identity from Minor, unless the court changed its order. Bio-Father feared Mother would also ruin a potential relationship between Bio-Father and Minor by sharing negative views with Minor regarding Bio-Father's religion. Bio-Father asserted that because Stepfather had limited contact with Minor after Mother and Stepfather's separation, Minor would not be harmed by learning the identity of Bio-Father.

The Department recommended Bio-Father and Minor have visits, and that the visits occur in a therapeutic setting. The Department reasoned that Minor would eventually learn about Bio-Father, and "it would be better [for Minor] to find out sooner rather than later."

D.    DISPOSITION

The Department recommended Minor continue to reside with Stepfather under family maintenance. The Department asserted family maintenance was preferable to dismissing the case because Stepfather might be unable to protect Minor. The Department based this concern on Stepfather allegedly lying when he obtained presumed father status in the family court in 2012. The Department asserted the 2012 presumed father finding was based upon Stepfather and Mother having been together

6

during the entirety of Minor's life; however, Mother and Stepfather were most likely separated when Mother married V.M.N. in 2010. The Department contended that Stepfather's willingness to lie for Mother created the possibility that he would be unable to protect Minor from Mother.

E. RULINGS ON JURISDICTION AND DISPOSITION

In regard to Minor, the juvenile court found true the following allegations: (1) Minor suffered serious physical harm due to Mother's actions (§ 300, subd. (a)); and (2) Minor suffered serious physical harm due to Mother's failure or inability to provide Minor with adequate medical treatment (§ 300, subd. (b)). In regard to M.A., the juvenile court found M.A.'s sibling had been abused, thus creating a risk that M.A. would be abused. (§ 300, subd. (j).) The court ordered Minor continue to be removed from Mother's custody. The court ordered Minor remain in Stepfather's custody on a plan of family maintenance.

F. HEARING ON THE REQUEST TO CHANGE A COURT ORDER

The juvenile court held a hearing on Bio-Father's request to change the no-contact order. (§ 388.) In 2008, Mother and Bio-Father agreed Mother would abort Minor. Bio-Father took Mother to the abortion clinic and paid for the abortion. Mother instructed Bio-Father to leave the clinic and said she would meet him at home. When Bio-Father arrived home, Mother was lying down as if she were in pain, and she told Bio-Father to move out of the home. Bio-Father moved out and the relationship ended. Bio-Father believed Mother had the abortion. Mother did not have the abortion. Minor was born in July 2008.

In 2010, Bio-Father was living in Texas. Mother called Bio-Father and informed him they had a child—Minor. Bio-Father moved to California in order to establish a relationship with Minor. Bio-Father began spending time with Minor. Bio-Father changed Minor's diaper, took her to the park, stayed overnight with Minor, put Minor to bed, and purchased items for Minor.

After two weeks, when Bio-Father did not express an interest in having a relationship with Mother, Mother "disappeared" along with Minor. At that point, Bio-Father contacted an attorney in order to legally establish his parental rights. Bio-Father "want[ed] to be involved in [Minor's] life, take care of her in any means [he] could." The family court proceedings lasted "a couple years."

In 2012, the family court found Stepfather was Minor's presumed father and concluded Bio-Father was not entitled to visits with Minor. Bio-Father spoke to multiple attorneys about appealing the family court's judgment, but he was told "that [he] had no chance." Bio-Father explained, "I just want her to know . . . that her father, from day one has been fighting courts in and out and still am. [¶] I am going on. [Minor is] eight and a half years old. I've been at it since two and a half. I'm stepping up. I want to take care of my daughter."

The juvenile court said the request for modification (§ 388) was a collateral attack on the 2012 family court order concerning paternity. The juvenile court explained that the only change that existed was a change in the law: After the family court's judgment, the law changed to permit a child to have three legal parents. The juvenile court then considered whether Bio-Father met the criteria for a *Kelsey S.* father.

8

Mother asserted the family court had already determined that *Kelsey S.* did not apply in this case. The juvenile court explained that the family court did not have the option of selecting three parents for Minor, hence, the change in circumstances and the juvenile court considering whether to modify the prior order.

The juvenile court treated Bio-Father's request as a request to modify the family court's order. The juvenile court said it could consider parentage for jurisdictional purposes or under the section 388 request. The court concluded that under either path, it had the authority to consider Minor's parentage. The court found Bio-Father was a *Kelsey S.* father. The court granted Bio-Father visits with Minor in a therapeutic setting, once every two weeks.

## DISCUSSION

### A. COLLATERAL ESTOPPEL

#### 1. *CONTENTION*

Mother and Stepfather contend the juvenile court's finding that Bio-Father is a *Kelsey S.* father is barred by collateral estoppel because the family court ruled on Bio-Father's paternity in 2012.

#### 2. *COLLATERAL ESTOPPEL LAW AND STANDARD OF REVIEW*

"The doctrine of collateral estoppel is one aspect of the concept of res judicata." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, fn. 3 (*Lucido*).) "Collateral estoppel, or issue preclusion, 'precludes relitigation of issues argued and decided in prior proceedings.' " (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896.) " 'The doctrines of res judicata and collateral estoppel will, when they apply, serve to

9

bar relitigation of a factual dispute even in those instances where the factual dispute was erroneously decided in favor of a party who did not testify truthfully.' " (*Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1485.)

Collateral estoppel has five requirements:  "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding.  Third, it must have been necessarily decided in the former proceeding.  Fourth, the decision in the former proceeding must be final and on the merits.  Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." (*Lucido*, *supra*, 51 Cal.3d at p. 341.)  We apply the de novo standard of review.  (*Johnson v. GlaxoSmithKline, Inc.* (2008) 166 Cal.App.4th 1497, 1507.)

3.     *ANALYSIS*

a)     Identical Issues

We begin with the first factor—whether the issues are identical.  "The 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings." (*Lucido*, *supra*, 51 Cal.3d at p. 342.)  A father can obtain statutory presumed father status by receiving his child into his home and openly presenting the child as his biological child.  (Fam. Code, § 7611, subd. (d).)  A *Kelsey S.* father is a biological father who attempted to be responsible for his child, but was thwarted by the child's mother from providing care for the child.  (*In re Jason J.*, *supra*, 175 Cal.App.4th at p. 932.)  A *Kelsey S.* father "qualif[ies] for the same parental rights as

those afforded by statute to presumptive fathers." (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1063.)

In the 2012 family court proceedings, Bio-Father testified about his belief that Mother had an abortion, their relationship ending, Mother informing him about Minor in August 2010, his move to California, spending time with Minor, purchasing items for Minor, Mother eventually withholding Minor from him, and filing the paternity action. Bio-Father asserted he met the criteria of a *Kelsey S.* father in that he was thwarted by Mother from fulfilling his responsibilities as a father, and that Stepfather failed to prove Stepfather met the criteria of a presumed father.

In the juvenile court proceedings, Bio-Father testified about his belief that Mother had an abortion, their relationship ending, Mother informing him about Minor in August 2010, his move to California, spending time with Minor, purchasing items for Minor, Mother eventually withholding Minor from him, and his efforts to assert his parental rights in 2012. Bio-Father asserted that finding him to be a *Kelsey S.* father and granting visitation would serve Minor's best interests.

The 2012 family court proceedings and the current juvenile court proceedings concerned the same facts: not knowing about Minor, eventually learning of Minor, moving to California, spending time with Minor, Mother withholding Minor, and legal efforts to assert parental rights. Because the same factual allegations were at stake in both proceedings, the issues are identical.

We note that in 2012, the family court found *Kelsey S.* was inapplicable. The family court briefly discussed *Kelsey S.* but concluded its application was limited to

adoption proceedings, and therefore it was not relevant to the paternity matter.  Thus, the family court did not make a factual determination concerning Bio-Father's status as a *Kelsey S.* father.  Instead, the family court decided Bio-Father did not meet the criteria of a presumed father as set forth in Family Code section 7611, subdivision (d).  Bio-Father did not appeal the family court's ruling.  In the instant case, the juvenile court decided Bio-Father did meet the criteria of a *Kelsey S.* father.

"Res judicata precludes . . . relitigation of the same cause of action on a different legal theory."  (*Mycogen Corp. v. Monsanto Co.*, *supra*, 28 Cal.4th at p. 897.)  Therefore, " ' "a judgment for the defendant is a bar to a subsequent action by the plaintiff based on the same injury to the same right, even though he presents a different legal ground for relief." ' "  (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 798.)

The juvenile court's *Kelsey S.* finding concerns Bio-Father's paternity of Minor, as did the family court's 2012 finding.  The juvenile court judgment concerned the *Kelsey S.* theory of paternity.  The family court's judgment was focused on a statutory theory of paternity.  (Fam. Code, § 7611, subd. (d).)  Because both cases concerned Bio-Father's paternity of Minor and were based upon the same facts, they concerned the same issue.  The fact that the hearings focused on different legal theories does not make the issues different—both hearings concerned the same factual allegations related to Bio-Father's paternity of Minor.  Thus, the first factor is met in that the current issue is identical to the issue decided in the 2012 family court proceeding.

12

### b) Actually Litigated

Second, we examine if the issue was actually litigated in the 2012 proceeding. An issue is actually litigated when the parties have an opportunity to present their full case. (*Lucido*, *supra*, 51 Cal.3d at p. 341.)

Bio-Father testified and provided argument in the 2012 family court proceeding. Bio-Father argued that the family court should find he is a *Kelsey S.* father and that Stepfather did not meet the criteria for a statutory presumed father. Given that Bio-Father presented evidence and argument, we concluded the issue was actually litigated in the 2012 proceeding.

### c) Necessarily Decided

Third, we examine if the issue was necessarily decided in the former proceeding. For the issue to be necessarily decided, it must "not have been 'entirely unnecessary' to the judgment." (*Lucido*, *supra*, 51 Cal.3d at p. 342.)

At the beginning of the 2012 family court proceeding, the family court said the issue before it was "whether or not either of the gentlemen involved in this case can establish a presumption of paternity under [Family Code section] 7611." Thus, the 2012 family court proceeding was a paternity action. Because it was a paternity action, the determination of Bio-Father's paternity status was a necessary part of the judgment.

### d) Final Judgment

Fourth, we determine whether the decision in the former proceeding was final and on the merits. A decision is final when it is "free from direct attack." (*Lucido*, *supra*, 51 Cal.3d at p. 342.)

13

The record includes a judgment from the family court that was filed on June 14, 2012. The judgment reflects Stepfather is Minor's presumed father, and Bio-Father failed to prove he is a presumed father. (Fam. Code, § 7611, subd. (d).) Bio-Father spoke to multiple attorneys about appealing the family court's judgment, but he was told "that [he] had no chance." Bio-Father did not appeal the judgment.

Given that five years have passed since the family court's judgment was entered and Bio-Father did not appeal, we conclude the judgment is final. The decision was on the merits because the family court decided the matter based upon the evidence presented by the parties. The matter was not dismissed for a procedural reason. Therefore, we conclude the 2012 decision is final and on the merits.

e) Parties

Fifth, we examine if the party against whom preclusion was sought is the same as, or in privity with, the party to the former proceeding.

The 2012 family court proceeding involved Mother, Stepfather, and Bio-Father. The juvenile court hearing involved Mother, Stepfather, Bio-Father, and the Department. Bio-Father is the party against whom preclusion was sought. Bio-Father was a party to both proceedings. Accordingly, we conclude the fifth factor is met.

f) Summary

"In the case of paternity proceedings, this common law doctrine [of res judicata and collateral estoppel] is embodied in [Family Code] section 7636, which states, 'The judgment or order of the court determining the existence or nonexistence of the parent and child relationship is determinative for all purposes except for actions brought

14

pursuant to Section 270 of the Penal Code.'[6] Reflecting this principle, it is commonly held that a judgment of paternity is entitled to 'res judicata effect.' " (*In re Alexander P.* (2016) 4 Cal.App.5th 475, 490.)

In sum, collateral estoppel applies to paternity proceedings, and all five factors of collateral estoppel have been met in this case. The current and former proceedings concerned Bio-Father's status as a presumed father of Minor either by statutory law or case law. The presumed father issue was litigated in 2012; the presumed father issue was necessarily decided in 2012; a final judgment on the merits was issued in 2012; and Bio-Father was a party in the former and current proceedings. As a result, the juvenile court's paternity finding is barred by collateral estoppel. We will reverse the juvenile court's ruling that Bio-Father is a *Kelsey S.* father.

### g) Bio-Father's Response

Bio-Father contends Family Code section 7636 only creates res judicata effect to a finding of biological paternity, not presumed fatherhood.

Family Code section 7636 provides, "The judgment or order of the court determining the existence or nonexistence of the parent and child relationship is determinative for all purposes except for actions brought pursuant to Section 270 of the Penal Code." " 'Parent and child relationship' as used in this [statute] means the *legal* relationship existing between a child and the child's natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties, and obligations. The term

---

**6** Penal Code section 270 concerns criminal abandonment or neglect of a child.

15

includes the mother and child relationship and the father and child relationship." (Fam. Code, § 7601, subd. (b), italics added.)

Given the foregoing statutes, a judgment or order of the court determining the existence or nonexistence of a *legal* parent and child relationship is determinative for all purposes except for those brought under Penal Code section 270 because the statutory language specifically includes legal relationships (Fam. Code, § 7601, subd. (b).) Accordingly, we are not persuaded that only a determination of a biological relationship is to be given res judicata effect.

## B. THREE PARENTS

Mother and Stepfather contend the juvenile court erred by finding Minor would suffer detriment if only Mother and Stepfather were recognized as her parents.

"As a general rule, ' "there can be only one presumed father." ' " (*In re Donovan L., Jr.* (2016) 244 Cal.App.4th 1075, 1086.) The exception to this rule is that more than two people can be a child's parents "if the court finds that recognizing only two parents would be detrimental to the child." (Fam. Code, § 7612, subd. (c).)[7]

The full text of Family Code section 7612, subdivision (c), is as follows: "In an appropriate action, a court may find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child. In determining detriment to the child, the

_____

[7] The exception allowing for more than two parents became effective in January 2014. (*In re Donovan L., Jr.*, *supra*, 244 Cal.App.4th at p. 1087.) The family court hearing was held in 2012.

court shall consider all relevant factors, including, but not limited to, the harm of removing the child from a stable placement with a parent who has fulfilled the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time. A finding of detriment to the child does not require a finding of unfitness of any of the parents or persons with a claim to parentage."

Because Bio-Father is not a *Kelsey S.* father, we must examine whether the three parent exception still applies in this case. We must examine what "a claim to parentage" and "parents" means within Family Code section 7612, subdivision (c), e.g., is it limited to presumed parents. If Bio-Father does not have a claim to parentage, then there are only two people with a claim to parentage and the three parent law is inapplicable.

We apply the de novo standard of review when interpreting statutory language. (*In re M.W.* (2008) 169 Cal.App.4th 1, 4.) "In construing a statute, our principal task is to ascertain the intent of the Legislature. [Citation.] First, we examine the words themselves, giving them their ordinary meaning." (*Id.* at p. 5.)

" ' "In dependency proceedings, 'fathers' are divided into four categories—. . . [biological], presumed, alleged, and de facto." ' " (*In re J.H.* (2011) 198 Cal.App.4th 635, 644.) Because the definition of father includes a variety of types of fathers, it is ambiguous what "parent" and "claim of parentage" mean in the subdivision. The definitions could be limited to presumed parents and the claims of presumed parents or the definitions could extend to de facto parents and the claims of de facto parents. As a

17

result, the statutory language is ambiguous in that the meaning of "claim to parentage" and "parents" is open to multiple possible definitions.

"If the language [of the statute] permits more than one reasonable interpretation, the court then looks to extrinsic aids, such as the object to be achieved and the evil to be remedied by the statute, the legislative history, public policy, and the statutory scheme of which the statute is a part." (*In re Luke W.* (2001) 88 Cal.App.4th 650, 655.)

We look to the other subdivisions in Family Code section 7612. Subdivision (a) provides, "Except as provided in Chapter 1 (commencing with Section 7540) and Chapter 3 (commencing with Section 7570) of Part 2, a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence." (Fam. Code, § 7612, subd. (a).) Family Code section 7611 concerns presumed parenthood and the criteria for obtaining the status of a presumed parent. Thus, subdivision (a) of Family Code section 7612 provides that the presumption of parenthood is rebuttable and the standard of proof for rebutting the presumption is clear and convincing evidence.

Family Code section 7612, subdivision (b), provides, "If two or more presumptions arise under Section 7610 or 7611 that conflict with each other, or if a presumption under Section 7611 conflicts with a claim pursuant to Section 7610, the presumption which on the facts is founded on the weightier considerations of policy and logic controls."

Family Code section 7610 provides that a parent child relationship may be established (1) "[b]etween a child and the natural parent" or (2) "[b]etween a child and

18

an adoptive parent." Thus, subdivision (b) of Family Code section 7612 explains how to proceed when "two or more presumptions arise." The subdivision explains that the conflicts arising from having "two or more presumptions" should be resolved in favor of policy and logic.

The next subdivision is subdivision (c)—the one at issue in this case. Subdivision (c) provides, "In an appropriate action, a court may find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child." (Fam. Code, § 7612, subd. (c).) We interpret this subdivision as meaning that if there are "two or more presumptions," as described in subdivision (b), and it would be harmful to the child to choose two parents based upon policy and logic, then the law will permit three parents.

Pertinent to our discussion here is the language "two or more presumptions" resulting from Family Code sections 7610 and/or 7611. Those two statutes concern natural parents, adoptive parents, and presumed parents. A "natural parent" is defined as a "a nonadoptive parent . . . whether biologically related to the child or not." (Fam. Code, § 7601, subd. (a).) Family Code section 7610 explains that natural parenthood can be proven with evidence of "having given birth to the child." Family Code section 7611 explains the presumption of being a natural parent. For example, a man is presumed to be a natural parent if he was married to the child's mother when the child was born (Fam. Code, § 7611, subd. (a)), or if he received the child into his home and held the child out as his biological child (Fam. Code, § 7611, subd. (d)).

19

Those statutes do not concern biological, alleged, and de facto fathers. Rather, they concern adoptive parents and natural parents; natural parents being those that provide proof of giving birth or who meet presumed parent criteria. Therefore, in construing Family Code section 7612 as a whole, we conclude "a claim to parentage" and "parents" means biological mothers (Fam. Code, § 7610, subd. (a)), adoptive parents (Fam. Code, § 7610, subd. (b)), and presumed parents (Fam. Code, § 7611).

In 2012, the family court found Bio-Father was not a presumed father. Bio-Father is a biological father. (*In re P.A.* (2011) 198 Cal.App.4th 974, 979 ["A biological father is a man whose paternity has been established, but who has not shown he is the child's presumed father"].) Because Bio-Father has the status of a biological father, not a presumed father, he does not have "a claim to parentage" as required by Family Code section 7612, subdivision (c). There are two people with a claim to parentage: Mother and Stepfather. Thus, the three parent law is inapplicable. As a result, we will reverse the juvenile court's finding that Minor has three parents.

C.     *KELSEY S.* FINDING

1.     *CONTENTION*

Mother and Stepfather contend substantial evidence does not support the finding that Bio-Father is a *Kelsey S.* father.

2.     *MOOTNESS*

We have concluded *ante* that the juvenile court's *Kelsey S.* ruling is barred by collateral estoppel and must be reversed. Accordingly, the substantial evidence issue is

moot because we can offer no further relief on the issue. (*In re N.S.* (2016) 245 Cal.App.4th 53, 60.)

Although the issue is moot, it is relevant to our discussion *post* concerning changed circumstances. (§ 388.) Rather than present a substantial evidence analysis regarding the *Kelsey S.* factors within our discussion of Bio-Father's request to change a court order (§ 388), for the sake of clarity, we will present the discussion in this portion of the opinion. To be clear, we are discussing this substantial evidence issue merely for the sake of our section 388 discussion *post*—the independent substantial evidence issue is moot.

### 3. *STANDARD OF REVIEW AND LAW*

We apply the substantial evidence standard of review in examining whether the juvenile court erred in finding Bio-Father met his burden of establishing that he is a *Kelsey S.* father. (*Adoption of Emilio G.* (2015) 235 Cal.App.4th 1133, 1144-1145.) Under this standard, we do not resolve conflicts in the evidence or reevaluate witnesses' credibility. Instead, we determine whether there is any reasonable, credible, and solid evidence that supports the juvenile court's finding. (*Id.* at p. 1145.)

"To qualify as a *Kelsey S.* father, a biological father must show he promptly stepped forward to assume full parental responsibilities for the child's well-being, including a financial, emotional or other commitment; the child's mother thwarted his efforts to assume his parental responsibilities; and he demonstrated a willingness to assume full custody of the child." (*In re Jason J.*, *supra*, 175 Cal.App.4th at p. 932.)

21

4. *ANALYSIS*

Substantial evidence reflects that Bio-Father promptly stepped forward to assume full parental responsibilities for Minor's well-being, including financial, emotional or other commitment. When Bio-Father learned of Minor, he quickly moved from Texas to California in order to establish a relationship with Minor. That evidence reflects Bio-Father promptly stepped forward.

When Bio-Father arrived in California, "he spent the entire day with [Minor] for about two weeks." Bio-Father changed Minor's diaper, took her to the park, stayed overnight with Minor, put Minor to bed, and purchased items for Minor. This evidence reflects Father assumed full parental responsibilities for Minor, including emotional and financial commitments.

Substantial evidence reflects Mother thwarted Bio-Father's efforts to assume his parental responsibilities. When Bio-Father declined to engage in a romantic relationship with Mother, Mother "evaded" Bio-Father and "disappeared" along with Minor. As a result, Bio-Father initiated family court proceedings to establish his parental rights. This evidence reflects Mother thwarted Bio-Father's efforts to assume his parental responsibilities because Mother did not provide Bio-Father access to Minor

The record reflects Bio-Father demonstrated a willingness to assume full custody of Minor. Bio-Father said, "I want to take care of my daughter." Bio-Father also said, in reference to Minor, "I want to take care of her if she needs anything at all." Bio-Father's testimony is substantial evidence of his willingness to assume full custody of Minor because he wants to provide for all of Minor's needs.

22

In sum, the juvenile court's finding that Bio-Father meets the criteria of a *Kelsey S.* father is supported by substantial evidence.

Mother contends the juvenile court's finding is not supported by substantial evidence because the juvenile court did not consider Bio-Father's conduct, or lack thereof, during the time Mother was pregnant with Minor. To the extent Bio-Father could be faulted for being unaware that Mother did not have an abortion, Mother is pointing to contrary evidence. This court does not reweigh the evidence. As explained *ante*, there is substantial evidence to support the juvenile court's finding, and, as a result, our examination of the issue ends there.

D.    VISITATION

Mother contends the juvenile court erred by granting Bio-Father visitation with Minor. Mother asserts the visits are not in Minor's best interests because only Stepfather is Minor's presumed father.

A juvenile court may order visitation between a biological father and his child if the visits will benefit the child. (§§ 361.5, subd. (a), 362.1, subd. (a); *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596; *In re Korbin Z.* (2016) 3 Cal.App.5th 511, 518.)

Under section 388, a person with an interest in a child may petition a juvenile court to modify a previous order on the grounds of changed circumstances. (§ 388; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.) The petitioner has the burden to show, by a preponderance of the evidence, a change of circumstances, and to show that the proposed modification is in the child's best interests. (*In re B.D.* (2008) 159

23

Cal.App.4th 1218, 1228; Cal. Rules of Court, rule 5.570(h)(1).) "We review the grant or denial of a petition for modification under section 388 for an abuse of discretion." (*B.D.*, at p. 1228.)

When proving a change in circumstance, it must be shown that the change relates to the purpose of the order. (*In re S.R.* (2009) 173 Cal.App.4th 864, 870.) Bio-Father sought to change the no-contact and no-visitation order to an order permitting visits.

On September 12, 2016, at a hearing in which Mother said she wanted a contested jurisdiction and disposition hearing, the juvenile court entered a no-contact order preventing Bio-Father from contacting Minor. The order was entered because, after Minor was detained, Bio-Father went to Stepfather's home and insisted that Bio-Father had a "right to the child." Mother's attorney informed the juvenile court that the family court had previously denied Bio-Father visitation with Minor as well as custody of Minor. The juvenile court explained that Bio-Father "is basically nobody to this child" and "just because he may have donated sperm, that does not make him the father." The juvenile court then ordered Bio-Father to not have contact with Minor.

The juvenile court's no-contact order was entered with the impression that Bio-Father "is basically nobody to this child" and "just . . . donated sperm." The juvenile court appears to have been unaware, in the early stage of the dependency proceedings, that Mother thwarted Bio-Father from having a relationship with Minor by deceiving Bio-Father regarding the abortion; that Bio-Father sought to have relationship with Minor upon learning of Minor's existence; and that Bio-Father spent time with Minor until Mother withheld Minor from him. Thus, those circumstances differ from the

24

juvenile court's initial impression of the circumstances when it entered the no-contact order. As we have explained *ante*, the juvenile court's finding that Bio-Father meets the criteria of a *Kelsey S.* father is supported by substantial evidence. While that particular legal finding is barred by collateral estoppel, it means there is credible evidence of the changed circumstance that Bio-Father was more than "nobody" and more than a "sperm donor" as initially perceived by the juvenile court at the September 12, 2016, hearing.

To the extent one may perceive the modification as a change to the family court's 2012 judgment (rather than the juvenile court's September 12 no-contact order), we will examine that angle as well. At the time of the family court's 2012 hearing, Minor was three years old. Mother described Minor as suffering from developmental delays due to being born prematurely. At the time of Bio-Father's 2016 request to change a court order (§ 388), Minor was eight years old. Minor was diagnosed with Usher syndrome, which can lead to deafness and blindness. Minor wears glasses and hearing aids; she is losing her eyesight and her hearing.

Additionally, (1) Minor suffered serious physical harm due to Mother's actions (§ 300, subd. (a)); and (2) Minor suffered serious physical harm due to Mother's failure or inability to provide the child with adequate medical treatment (§ 300, subd. (b)). Minor's medical conditions and Mother's mistreatment of Minor were changed circumstances from the time of the family court's 2012 order denying Bio-Father visitation with Minor

Accordingly, we conclude the juvenile court did not err in concluding circumstances had changed (1) from the time of the family court's 2012 no visitation

25

order, and (2) from the juvenile court's understanding of the circumstances when it entered the no-contact order. Next, we examine whether the juvenile court abused its discretion in determining that visits with Bio-Father, in a therapeutic setting, would be in Minor's best interests.

Minor was allergic to the sun. As a result, Minor spent lunch, recess, and physical education class in the school nurse's office. Minor had few friends at school as a result of being unable to be outside, and was bullied at school.

Genetic tests revealed Minor had three genes that can cause hearing loss. One of those genes led to Minor being diagnosed with Usher syndrome, which can lead to deafness and blindness. Minor wears glasses and hearing aids. While Minor was with a Department social worker, Minor "constantly talk[ed] about how she was a 'bad' child. She was observed to smack her head and say that she was stupid on occasion." Additionally, Minor "spoke of not being pretty while wearing her glasses and of being even less pretty when she took them off."

Prior to Minor being detained, Stepfather visited Minor approximately once a month. Mother caused Minor to suffer serious physical harm. (§ 300, subd. (a).) The Department social worker assigned to Minor's case testified that it would be beneficial to Minor to have an adult in her life who loves her, given Minor's negative self-image. The social worker testified that Bio-Father appeared to be committed to Minor and wanted to be part of Minor's life. The social worker also opined that it was beneficial for children to know their biological parents.

26

From this evidence, the juvenile court could reasonably conclude that Minor would benefit from visitation with Bio-Father because Minor needed more loving relationships in her life. Minor has few friends, saw Stepfather only once a month, and was mistreated by Mother. A loving relationship with Bio-Father would benefit Minor by providing her a positive connection with another person when she has few positive relationships. Moreover, Minor suffers from medical issues due to a genetic condition. One could reasonably infer that having a relationship with her biological father may provide a future opportunity for further medical insight into Minor's genetic condition. Given the foregoing evidence, the juvenile court could reasonably conclude that Minor would benefit from visits with Bio-Father. As a result, the juvenile court did not abuse its discretion by ordering visits between Minor and Bio-Father.[8]

E.    TERMINATION OF JURISDICTION

Mother and Stepfather contend the juvenile court erred by not terminating the court's jurisdiction over Minor.

After a juvenile court finds a child comes within the court's jurisdiction and determines it would be detrimental to return the child to the custodial parent's custody, the court must determine if it would be detrimental to the child to place the child in the

---

[8] The juvenile court found the changed circumstance was the new law providing for three parents and the visits would be in Minor's best interests because Bio-Father was a *Kelsey S.* father. We do not address this reasoning because we review the juvenile court's ruling, not its reasoning. (*In re Zamer G.* (2007) 153 Cal.App.4th 1253, 1271.)

custody of the noncustodial parent. (§ 361.2, subd. (a); *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1129.)

Upon placing the child with the previously noncustodial parent, the juvenile court may (1) order that parent to become the legal and physical custodian of the child and terminate jurisdiction; (2) order the parent assume custody subject to the court's jurisdiction and require a home visit within three months; or (3) order the parent assume custody subject to the court's jurisdiction and order that reunification services be provided to the offending parent and/or nonoffending parent, and the court may later determine which parent, if either, will have custody of the child. (§ 361.2, subd. (b).) So, if there is a need for ongoing supervision, the juvenile court may continue its jurisdiction. (*In re Austin P.*, *supra*, 118 Cal.App.4th at p. 1135.) We review the juvenile court's determination for an abuse of discretion. (*Ibid.*)

Stepfather suffered a domestic violence conviction in 2003. Stepfather was also arrested "for marijuana and a DUI in 2003." Stepfather blamed his 2003 conduct on (1) having "a lot of responsibilities"; and (2) being "young and ha[ving] a temper." Stepfather was 32 years old in 2003.

Stepfather occasionally drank alcohol. After Mother and Stepfather separated, Stepfather visited Minor approximately once a month. After her detainment, Minor stayed in the same bedroom as Stepfather. Stepfather did not believe Mother had anger issues; yet, Mother bit Minor's arm causing a bruise when Mother was " 'extremely frustrated' " with Minor. Mother hit Minor's leg " 'out of desperation.' " Mother said "raising [Minor] is hard."

28

This evidence could reasonably cause the juvenile court concern. Given that Minor has special needs, Stepfather may again feel he has too many responsibilities in caring for Minor and, as a result, resort to drug or alcohol abuse. Stepfather only visited Minor once a month, but is now living with her and sharing a room with her. The juvenile court could reasonably be concerned that the stress of caring for a child with health concerns will cause Stepfather to resort to drugs or alcohol as coping mechanisms. Additionally, Stepfather's temper could lead to incidents of violence.

The Department social worker believed Stepfather obtained presumed father status by lying to the family court. The social worker explained that Stepfather appeared to be lying when he claimed to have only been separated from Mother at the time Minor was conceived because Stepfather and Mother were presumably separated when Mother married V.M.N. in 2010. The social worker feared Stepfather's willingness to lie for Mother's benefit would make him unable to protect Minor from Mother. This evidence could also cause the juvenile court to be concerned for Minor. If Stepfather is willing to lie to the court to benefit Mother, and Stepfather believes Mother does not have anger issues despite her admissions that she physically harmed Minor, it is possible Stepfather would place Minor in risky situations with Mother or not report injuries Minor suffers while visiting Mother.

In sum, given the evidence of risks facing Minor while in Stepfather's care, the juvenile court could reasonably conclude there is a need for ongoing supervision. Accordingly, we conclude the juvenile court did not err by not terminating jurisdiction.

Stepfather contends the juvenile court should have applied section 364, which provides the procedure for a ward of the court who is "not removed from the physical custody of his or her parent." (§ 364, subd. (a).) When a child is not removed from his/her parent's custody then "[t]he court shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify [an] initial assumption of jurisdiction under section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364, subd. (c).)

Stepfather and Mother separated in 2013. Following the 2013 separation, Stepfather agreed to pay $1,500 in child support for Minor and he visited her approximately once a month. It can be inferred from this evidence that Stepfather did not reside with Minor at the time she was detained in 2016. Because Stepfather was a noncustodial parent, section 364, which provides the procedure for a child *not* being removed, is inapplicable. Minor was removed from her home with Mother and placed with Stepfather, her noncustodial parent. As a result, section 361.2, which is discussed *ante*, is applicable.

F.    DUE PROCESS

The *Kelsey S.* issue and the three parents issue were not raised in Bio-Father's request to change a court order. (§ 388.) Thus, we requested supplemental briefing from the parties on the issue of whether there were any due process implications to the juvenile court finding Bio-Father to be a *Kelsey S.* father. (See *In re Jason J.* (2009)

30

175 Cal.App.4th 922, 932 ["A 'party seeking status as a father under *Kelsey S.* must be clear he wants to be so declared' "].)

Mother contends she forfeited any due process issues by not objecting in the juvenile court. Bio-Father agrees that any due process issues were forfeited due to the parties' failure to object. Minor and the Department assert there are no due process implications arising from the lack of notice. Stepfather asserts Bio-Father's request to change a court order contained an implicit request for presumed father status. Because the parties conclude their due process rights were not harmed or that they forfeited the issue, we will not address the issue further.

### DISPOSITION

The juvenile court's ruling that M.Z. is a *Kelsey S.* father is reversed. The juvenile court's ruling that Minor has three parents is reversed. In all other respects, including the visitation order between M.Z. and Minor, the judgment is affirmed.

CERTIFIED FOR PUBLICATION

MILLER
Acting P. J.

We concur:

SLOUGH
J.

FIELDS
J.

31