Filed 2/24/22  In re N.P. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re N.P., a Person Coming Under the Juvenile Court Law. | C093985 C094357 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.P., <br><br> Defendant and Appellant. | (Super. Ct. No. STKJDDP20200000370) |

J.P., biological father of minor N.P. (father), appeals from the juvenile court's orders denying him presumed father status and reunification services as to N.P.  (Welf. & Inst. Code, §§ 361.5, 395; statutory section citations that follow are to the Welfare and Institutions Code.)  Father contends he met the criteria for presumed father status under Family Code section 7611, subdivision (d), and the presumption of paternity was not

1

rebutted. He further argues that even if he was correctly designated only a biological father, the court abused its discretion when it denied him reunification services. We affirm the juvenile court's orders.

FACTS AND HISTORY OF THE PROCEEDINGS

The precipitating incident for this case happened on October 6, 2020, when police responded to a report of a hit-and-run at a motel, where staff saw mother driving in the parking lot, then walking into a motel room with a young child. Officers found father and mother in the room, intoxicated, and minors A.P. and N.P., who were then 23 months old and nine months old, respectively. N.P. was unbuckled in a car seat in the bathroom next to a bathtub that had standing water in it. The police arrested father.

In interviews shortly thereafter, mother stated that father was the father to both A.P. and N.P., although A.P. had a different biological father. Both mother and father stated father was present at N.P.'s birth and signed the birth certificate. Father explained they had placed N.P. in the bathroom because it was quieter. Both mother and father acknowledged they had been drunk, and father explained they both had problems with alcohol. Father was on probation for a criminal threats conviction that had resulted from an incident where he threatened to kill mother. He acknowledged a history of domestic violence with mother.

*Petition and Initial Detention*

On October 7, 2020, San Joaquin County Human Services Agency (Agency) filed a dependency petition under section 300 asserting jurisdiction over A.P. and N.P. The petition alleged the parents had failed to adequately supervise or protect the minors in the motel room incident, and further alleged mother and father had recurrent substance abuse issues that they failed to remedy over time and that had impaired their ability to care for the minors. The petition also alleged a history of domestic violence in front of the minors, including the criminal threats conviction father had mentioned and a separate

2

charge for inflicting corporal injury on a dating partner.  Finally, the petition alleged mother and father did not have suitable housing and could not provide for the basic needs of the minors, in that, after the October 6 incident, father had been incarcerated and mother had been kicked out of a homeless shelter.

The juvenile court ordered the minors detained on October 8, 2020.  On October 27, 2020, the court found the petition allegations true as to father and found the minors came within the court's jurisdiction under section 300, subdivision (b)(1).  Father did not appear for the hearing, and the court set a contested jurisdiction hearing for mother.  At that hearing on December 8, 2020, the Agency struck one phrase from the petition and mother submitted on jurisdiction.  Father made his first appearance in the case on January 12, 2021.

*Disposition Report*

On January 29, 2021, the Agency filed a disposition report.  The report described an October 14, 2020 interview with father discussing his substance abuse history.  Father started drinking when he was 12 years old and had "been drinking ever since."  He had used marijuana, cocaine, mushrooms, and methamphetamine, and reported using methamphetamine "a couple of days ago."  He agreed that his substance abuse inhibited his ability to safely parent his children.  Father stated that he had been referred to substance abuse treatment programs, but had not successfully completed one.  In addition to N.P., father was the father for A.P., although he was not A.P.'s biological father, and also had a 15-year-old daughter.  Father explained he had signed away parental rights for his oldest daughter because of his substance abuse problems and had not had any contact with her "since the age of three or seven."  The social worker called father later to continue the interview, but each time the social worker called father was "too intoxicated and aggressive" to speak.

3

The social worker described father as "very controlling, aggressive, manipulative, threatening, and demeaning of the mother without guilt or shame." Father recognized his substance abuse problems damaged his ability to parent his children, but continued to drink. He was only willing to participate in services after he had been incarcerated, and, even then, wanted the social worker to write him letters of recommendation or work with his probation officer to reduce his potential sentence in exchange for participation in the services.

The social worker also described a series of conversations with mother and father between October 2020 and January 2021. In October 2020, father sent the social worker lengthy, rambling text messages in which he, among other things: accused the dependency system of being used "to obtain convictions regardless of the facts"; acknowledged he "should have not exposed my children to that kind of behavior," but argued the charges against him had been "heavily fabricated"; accused the social worker of being dishonest; and threatened to kill himself. When the social worker called to check in on him, father asked the social worker to keep him from going to prison.

In January 2021, father told the social worker mother had a "lot of issues" and was not "putting her girls first." Mother stated she had broken up with father and he had been acting "really out of control." One week later, father called the social worker and peppered her with questions about mother and her visitations with the minors. A few days after that, mother described feeling like she could not get away from father, and that he would only leave her "alone . . . if she allows him to take [N.P.]" She worried that he would go on a "rampage" looking for her after he was released from jail.

Father had initially refused to appear in court because he feared arrest on outstanding warrants. He similarly declined a drug treatment program because he was worried his probation officer would arrest him. The social worker opined that father's ongoing substance abuse issues, coupled with his history of domestic violence and criminal behavior, created a safety concern for the minors. His preoccupation with

4

mother and failure to participate in services, or even appear in court until he was incarcerated and the social worker arranged for his transport to court, were also concerning. Thus, the social worker did not recommend reunification services for father.

*Presumed Father Motion and Hearing*

On March 3, 2021, father filed a motion to designate him presumed father for both minors. The motion was based on a declaration by counsel that father had lived with mother both before and after the births of the minors, was present when they were born, held out both minors to be his own, and worked to support both minors. The Agency opposed the motion and filed several text messages in which father disclaimed responsibility for A.P., called her names, and admitted hitting her with a pillow or blanket. The opposition also attached a June 12, 2020 family court order awarding sole legal and physical custody of N.P. to mother. Mother also opposed the motion and attached a January 13, 2021 criminal protective order protecting mother and the minors from father. The minors filed a response to the motion saying more evidence was needed to make a conclusive determination.

Mother testified at the hearing on the motion. She stated that, as of September 2020, she was the one who took care of the minors and paid for their expenses, and that father was typically incarcerated or in other programming. The first time father contributed to their care was in September 2020, when he bought a box of diapers and some clothing. Mother stated father never took her to any of her prenatal appointments when she was pregnant. He was, however, present at N.P.'s birth, signed her birth certificate, and acknowledged her as his daughter.

Mother stated father abused her when she was pregnant with both children and went to jail "a couple of times" for hitting her when she was pregnant with A.P.; the minors had also been present for some instances of abuse. She described multiple incidents of abuse, including one in which father choked mother hard enough that she had

5

to wear a neck brace, and another where he had bruised her leg when she was pregnant with N.P. He once slapped her face when she was changing N.P.'s diaper. Once father was drunk and hit A.P. with a blanket, telling her to "shut up and stop crying." Father had been incarcerated for threatening to kill mother in April 2020.

Mother gave a detailed accounting of where they had lived. Beginning in April 2019, when father and mother began living together, they moved from place to place staying with friends or family, largely paying rent using aid mother received and paying for food using food stamps. When N.P. was born in December 2019, they were living in a room in father's friend's house, for which they split the rent using mother's aid payments and father's unemployment payments. One week after N.P. was born, father moved out and into a program. After a month, he moved back in with mother and the minors in the maternal grandmother's house, where they lived off of mother's welfare payments.

Father then left to live with a friend. Mother and the minors followed later because father wanted N.P. to live with him and mother did not want to leave N.P. alone with father. From April 2020 to about August 2020, father was incarcerated and mother and the minors moved to mother's friend's house. Mother and the minors then went to a shelter and father was in a treatment program until October 2020, when the October 6 incident occurred. In total, father lived with minor for the month of February 2020, April 2020, and part of August 2020. N.P. also saw him three or four times in September 2020.

Father also testified and stated that he actually saw the minors "almost every other day" while he was in treatment. On some occasions, mother would drop the minors off with father and he would watch them while she was at work. He also sent the minors letters.

He disputed mother's claim that he did not attend prenatal appointments for N.P., and stated that even when he was not present, he paid for Uber rides to get her to the appointments. He also stated that he paid the rent when he lived with mother.

6

Father admitted physically abusing mother but denied he had ever done so in front of the minors, denied specific instances in which he had hit her, and denied striking her while she was pregnant. He later admitted slapping mother while she was pregnant. He did not recall ever hitting A.P. with a blanket.

As to the court hearings, father initially stated he did not appear because he was "under the influence of drugs and alcohol" and did not think his presence would make a difference. He did not remember why he was not present for the December 2020 hearing. He later admitted he had not come to court because he was afraid he would be arrested.

Considering the testimony, the juvenile court observed it was "hard to reconcile the stories because they're so diametrically opposed in many aspects." The court noted father's pattern of incarcerations and domestic violence. Explaining the legal standard, the court stated a presumed father should "fully participate in all factors, not just financial. It has to be emotional, has to be supportive in times of need, have to seek custody at the earliest possible intervention." The court noted father was in custody or treatment for long periods of N.P.'s life, but credited father's testimony that mother and father shared expenses over an extended period of time. Comparing the testimony however, the court noted mother's testimony "was much clearer when it came to dates and times and recalling," while "I can't recall was a constant theme" of father's testimony. The court concluded father was not entitled to presumed father status as to either minor and confirmed his status as the biological father of N.P. and the alleged father of A.P. The court later designated a different man to be A.P.'s biological father.

*Disposition Hearing*

At the disposition hearing on April 29, 2021, father's case manager for drug court testified that father had had four alcoholic drinks the day before he met the case manager for the first time, on February 1, 2021. Since participating in drug court, father had not had any positive drug tests but had problems with breaking program guidelines. Father's

7

substance abuse counselor testified he had completed an anger management course and was making progress in expressing his emotions. She stated father was working on his manipulative behaviors and following program rules and would benefit from additional training.

An Agency social worker testified that father did not have a "sincere and a full commitment" to participate in services, a conclusion she based on father's continuing behaviors in his treatment program and towards mother. She observed that father demonstrated manipulative behavior when he was given directions he disagreed with; for instance, father sought to replace his first substance abuse counselor after a disagreement and also tried to get a new social worker appointed to his case. The social worker had also seen visits between father and N.P., which had been occurring once per week for one hour. The visits had not started until the end of March 2021 and "started rough," with N.P. crying and acting "uncomfortable and scared," but the visits were currently "going okay." The social worker acknowledged that father engaged appropriately with N.P. during the visits. She recommended father not receive reunification services because father had been late to engage in services, continued to drink and abuse substances, had a pending domestic violence matter, showed little genuine willingness to change, and demonstrated manipulative behavior. Moreover, she noted father had not been around N.P. for much of her life and did not express interest in participating in services until after he was incarcerated.

Father testified as well, stating that alcohol was his real impediment to successful parenting. He recounted the time he had lived with N.P., saying he lived with her for two months after she was born, then went away for his program, then lived with her and mother for another three months before leaving for another program. He also recounted his history of domestic violence towards mother, stating he had one conviction from 2018, two other incidents that were not reflected in his records, and his most recent criminal threats from 2020. Father acknowledged violating the criminal protective order

8

mother had against him on multiple occasions. Father ascribed N.P.'s crying during his visits to the "gloomy" building where the visits occurred.

Finally, father described his history with substance abuse programs. He first entered a program when he was 18 years old, but did not complete the program. He graduated from a second treatment program in 2015, and relapsed with alcohol, cocaine, and methamphetamine shortly thereafter. He had attended a third program in 2018 and was released to a sober living environment, but then relapsed. His fourth program was in 2020, but he was kicked out for getting in a fight with another resident, then relapsed with alcohol and methamphetamine.

After hearing argument from the parties, the juvenile court summarized its findings. The court noted that father had unsuccessfully attempted to address his substance abuse issues on multiple occasions, but observed father had not managed to do anything "above and beyond than just state his love" for N.P. Rather, he had been out of N.P.'s life for long periods of time when he was in custody, in treatment, or "on the run." Father had not taken advantage of services until later in the case, which was a wasted opportunity to "get engaged and demonstrate sincerity." He also had recent criminal offenses as to mother and was violating the criminal protective order, suggesting that father had not demonstrated he could follow the law. Thus, the court concluded, reunification services for father would not benefit the minor because father's actions had made it so that his relationship with the minor was not "as strong and bonded as father would like it to be."

Father separately appealed the orders denying presumed father status and reunification services, and we consolidated the appeals at his request.

9

DISCUSSION

I

*Presumed Father*

Father argues the juvenile court erred when it denied him presumed parent status as to N.P. (father does not challenge the order as to A.P.) because he met the criteria for that designation under Family Code section 7611, subdivision (d), and the Agency did not present clear and convincing evidence otherwise. As a threshold issue, father also contends we should only consider each issue in this case based on the facts as the juvenile court received them at the time it made its respective orders. In particular, we should disregard the fact that shortly after the court denied father reunification services, the court also suspended father's visitation rights because he dropped out of his treatment program. Even absent these facts, however, we disagree the juvenile court erred when it denied father presumed parent status.

"There are three types of fathers in juvenile dependency law: presumed, biological, and alleged. [Citation.] A presumed father is a man who meets one or more specified criteria in [Family Code] section 7611. A biological father is a man whose paternity has been established, but who has not shown he is the child's presumed father. An alleged father . . . is a man who has not established biological paternity or presumed father status. [Citation.]" (*In re P.A.* (2011) 198 Cal.App.4th 974, 979.) Because presumed status comes with the right "to appointed counsel, custody (if there is no finding of detriment) and reunification services," it " 'ranks highest' " amongst the three. (*Id.* at p. 980.) " 'The statutory purpose of [Family Code section 7611] is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not.' [Citation.]" (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.)

10

At issue here is the presumption set forth in Family Code section 7611, subdivision (d), which provides presumed parent status if "[t]he presumed parent receives the child into their home and openly holds out the child as their natural child." Presumed parent status requires a "fully developed parental relationship with the child." (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 776, italics omitted.) "Presumed fatherhood, for the purposes of dependency proceedings, denotes one who 'promptly comes forward and demonstrates a full commitment to [parental] responsibilities—emotional, financial, and otherwise.' " (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801-802.) To determine whether a person qualifies for presumed parent status, "courts have looked to such factors as whether the [person] actively helped the mother in prenatal care; whether he [or she] paid pregnancy and birth expenses commensurate with his [or her] ability to do so; whether he [or she] promptly took legal action to obtain custody of the child; whether he [or she] sought to have his [or her] name placed on the birth certificate; whether and how long he [or she] cared for the child; whether there is unequivocal evidence that he [or she] had acknowledged the child; the number of people to whom he [or she] had acknowledged the child; whether he [or she] provided for the child after it no longer resided with him [or her]; whether, if the child needed public benefits, he [or she] had pursued completion of the requisite paperwork; and whether his [or her] care was merely incidental." (*In re T.R., supra*, 132 Cal.App.4th at p. 1211.)

"One who claims he [or she] is entitled to presumed [parent] status has the burden of establishing, by a preponderance of the evidence, the facts supporting that entitlement. [Citation.] A presumption arising under [Family Code] section 7611 is a 'rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence.' [Citation.]" (*In re T.R., supra*, 132 Cal.App.4th at p. 1210.) On appeal, we review the juvenile court's determination of presumed father status under the substantial evidence standard. (*In re J.H.* (2011) 198 Cal.App.4th 635, 646.)

Here father was present for N.P.'s birth, signed her birth certificate, and acknowledged her as his child, all of which are factors that weigh in favor of presumed father status. He also, on one occasion, bought diapers and clothes for N.P. However, as the juvenile court noted, the testimony between mother and father was largely split on several of the other relevant factors. For instance, mother and father disagreed about whether father attended any of mother's prenatal appointments when she was pregnant with N.P. They similarly disagreed about whether and how long father cared for N.P.; mother described a relationship in which she was largely responsible for N.P.'s care and father only occasionally lived with them when he was not in jail or treatment, while father described situations in which mother frequently relied on him to provide childcare.

Father's contention that he was entitled to presumed father status largely adopts his testimony as the true version of the facts and asserts that, on those facts, he satisfied an adequate number of factors to be a presumed father. The juvenile court, however, compared the testimony and concluded mother was more credible in light of her recall and specificity. We do not reweigh father's credibility on appeal. (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121.) Moreover, other relevant factors weighed against presumed father status. Father admitted, for instance, that he did not appear in N.P.'s dependency case until January 2021, when he was compelled to do so because he was in custody. He admitted that he had not wanted to appear in court because he worried he would be arrested on outstanding warrants, suggesting he was more concerned about his own legal problems than N.P.'s well-being. In a similar vein, mother testified the October 6, 2020 incident had occurred while mother and the minors were staying in a shelter and father called her for help because he had been kicked out his treatment program, even though her assistance could have caused her and the minors to lose their place at the shelter. We disagree with father's argument that these facts could not constitute "evidence that father should not be considered N.P.'s presumed father" simply because he had already cemented his status "long before this dependency was

commenced"; on the contrary, father's actions reflected his commitment to parenting responsibilities versus his own self interest, and as such are highly relevant to the presumed father calculus. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1653-1654.)

Even assuming father established a preponderance of the evidence that he was entitled to presumed father status, clear and convincing evidence adequately rebutted any presumption in his favor. We find instructive *In re T.R., supra*, 132 Cal.App.4th 1202. There T.R.'s stepfather, a registered sex offender, sought presumed parent status. (*Id.* at pp. 1206-1207.) T.R.'s sister and grandmother had reported incidents of sexually inappropriate conduct between the stepfather and T.R., and the juvenile court denied the stepfather presumed parent status. (*Ibid.*) The appellate court observed the stepfather had "openly acknowledged T.R. as his daughter, provided financial support, and received her in his home," which supported presumed parent status. (*Id.* at p. 1211.) The sexual abuse, however, was "antithetical to a parent's role and was a blatant violation of parental responsibilities," and it "more than counterbalanced the factors favoring [the stepfather's] presumed father status." (*Ibid.*) "If an individual can qualify for presumed father status based on his good deeds consistent with parental responsibilities," the court reasoned, "it follows that under certain circumstances he can be disqualified by repugnant conduct that is detrimental to the child." (*Id.* at p. 1212.)

While father's conduct towards mother and the minors was not as severe as that described in *In re T.R.*, his actions were sufficiently detrimental to N.P. to counterbalance the limited factors supporting presumed father status. Father admitted multiple incidents of domestic violence towards mother and violated the protective order, which protected both mother and the minors, several times. Evidence also supported the conclusion father had abused mother when she was pregnant with N.P., causing her a bruise on her leg, and later slapped her while she was changing N.P.'s diaper. Even leaving aside the multiple instances of verbal and physical abuse towards N.P.'s older sister, the testimony was adequate to show that father had engaged in conduct that was detrimental to N.P. The

acts of domestic violence were a valid factor for the juvenile court to consider, and we disagree with father's characterization of them as "minor incidents" and his claim they would not have been reflective of his relationship with N.P. because she "was still an infant" and would have had "no concept of what was happening." (*In re Alexander P.* (2016) 4 Cal.App.5th 475, 495-496 [contrasting the abuse of the child in *In re T.R.* and reasoning that while domestic violence against the mother was not disqualifying as a matter of law, it was one factor to consider].) In conjunction with the evidence of the other relevant factors, there was substantial evidence to support the court's denial of presumed father status.

II

*Reunification Services*

Father further asserts that, even if he was correctly determined to be a biological father, the court should have ordered reunification services under section 361.5, subdivision (a). We disagree.

"A biological father may receive reunification services only if the court finds that granting him services would benefit the child." (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 589; see also *In re O.S.* (2002) 102 Cal.App.4th 1402, 1410; § 361.5, subd. (a).) "It is the parent's burden to prove that the minor would benefit from the provision of court-ordered services." (*Jennifer S. v. Superior Court, supra*, 15 Cal.App.5th at p. 1124.)

The juvenile court's decision to deny optional reunification services to a biological father who has not attained the status of presumed father is reviewed for abuse of discretion. (*In re Elijah V., supra*, 127 Cal.App.4th at pp. 588-589.) "When applying the deferential abuse of discretion standard, 'the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' " (*In re C.B.* (2010) 190 Cal.App.4th 102, 123.)

14

There was ample evidence supporting the juvenile court's finding that reunification services would not benefit N.P. The disposition report indicated father realized his substance abuse prevented him from adequately parenting the minors, but refused to take measures to remedy the problem. Although a social worker referred him to treatment services, he refused to pursue the services because he feared arrest. When he agreed to participate in services, he attempted to leverage his participation to obtain decreased jail time for himself. He sent the social worker long, threatening text messages and badgered her about mother and mother's relationship with the children. He also had multiple incidents of domestic violence involving mother and the minors, causing mother to obtain a protective order.

As discussed above, he did not appear in the case until he was in custody and the social worker made transportation arrangements for him. Despite his continuing problems with alcohol and his frequent statements that alcohol caused him to behave badly, he continued to drink throughout the case, to the point he was unable to communicate with the social worker, and heavily drank the day before meeting with his drug court case manager in February 2021. And, even after he engaged in some services, the Agency social worker observed few changes in his behavior. He had not remedied the deficits that had originally been alleged in the petition and was unlikely to do so in the future. Accordingly, the social worker recommended against reunification services, concluding "the father's substance abuse, criminal behavior, history of domestic violence, controlling and manipulative behavior places him at high risk of failing to successfully reunify with his daughter."

Nor did father's testimony effectively rebut any of the social worker's conclusions. Rather than acknowledging his behavioral problems, he attributed his parenting issues only to alcohol, saying he did not feel he was manipulative of others, and discounted his poor interactions with N.P. as merely a result of the visitation facilities

15

that were offered. He also acknowledged multiple domestic violence incidents with mother, including two that were not on the record, and violations of the protective order.

Father argues that the juvenile court's order incorrectly required father to "do after care, get a job, [and] get a home" *before* he would be entitled to services, essentially "putting the cart before the horse" by demanding that father resolve his problems before receiving services to resolve those problems. The court's statement about father getting after care and a job, however, concluded that "the last couple of months is not sufficient to demonstrate to this Court that you have the ability to get it done this time." In context, the court's statement meant only that getting a job and getting a home were examples of goals for reunification services, and father simply had not shown a likelihood that he could accomplish those goals, even with services. Whether the parties would benefit from reunification services was permissible for the court to consider. (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 76 [upholding denial of services that were "an exercise in futility"].) We see no abuse of discretion in the court's decision to deny reunification services.

DISPOSITION

The juvenile court's orders are affirmed.

_____

HULL, J.

We concur:

_____

BLEASE, Acting P. J.

_____

HOCH, J.

16